## BARRY D. NUSS *v.* STATE OF INDIANA.

[No. 1-874A123. Filed June 5, 1975.]

*John A. Kesler,* of Terre Haute, *Kenneth E. Levin,* of Terre Haute, for appellant.

*Theodore L. Sendak,* Attorney General, *Harry John Watson, III,* Deputy Attorney General, for appellee.

LOWDERMILK, J.—Defendant-appellant, Barry D. Nuss (Nuss) was charged with second degree murder, pleaded self defense, and was found guilty of the lesser included offense of voluntary manslaughter by a jury, and was duly sentenced pursuant to statute.

The facts most favorable to the State are as follows:

Nuss, an electrical systems designer from New Jersey, was on a long-term assignment in Terre Haute for his employer. During his stay in Terre Haute he occupied Room 130 of the Imperial House Motel as his only residence.

Ella Joy, the wife of Alan Joy, the deceased, worked at the Imperial House Motel where Nuss resided and became acquainted with him and occasionally visited his motel room. During their period of friendship Nuss and Ella had several intimate conversations during which Ella related several stories about her marriage and Alan's physical abuse of her. Ella allegedly stated that she associated Alan's violent change in temperament with his usage of drugs. An action for divorce between Alan and Ella had been pending for some time and was still pending at the time of the incident in which Alan lost his life.

As a result of threats and annoyances by Alan to Nuss, Mr. Nuss voluntarily went to Colorado to work so that he would be away from Terre Haute and avoid trouble.

While Nuss was in Colorado Ella phoned him twice and informed him Alan had taken a rifle and a shotgun and

had stated that the defendant would "get his." Later Nuss returned to Terre Haute to his work and allegedly received a telephone call from Alan and Alan informed him that when Alan finished with him there would not be enough left to bury. On several later occasions Alan allegedly threatened Nuss but none of the threats were reported to the police.

On June 9, 1973, at about 6:00 o'clock A.M. Alan called Ella and asked her about a story which he had heard concerning her relationship with Nuss. Ella then called Nuss and made arrangements to meet him at about 6:30 that morning and she did meet with Nuss away from the motel in an attempt to straighten out the problem with the story and prevent trouble. After this meeting with Nuss, Ella went to Alan's trailer where she awakened Alan and his roommate and attempted to explain things to Alan. After Ella had left the trailer Alan telephoned Nuss and questioned him about going out with married women. During this conversation Alan allegedly told Nuss that the only way he would leave Terre Haute would be in a coffin. Alan allegedly told his roommate, after the telephone conversation with Nuss, that he was going down to Nuss' motel and "beat his a— and kick the s— out of him." Thereafter, Alan put on his old clothes and removed his watch, rings, jewelry, and wallet before leaving his home. Before Alan left the trailer he was warned by his roommate not to go but Alan responded "I don't care, it's something I've gotta do."

On that date Alan arrived at the Imperial House Motel and kicked on the door of Room 130 and yelled at Nuss to come out. After about five minutes of Alan's actions outside Nuss opened the door about six inches, the length of the chain stop, and attempted to convince Alan to leave. Alan refused to leave and Nuss forcibly closed the door. After a short time Nuss removed the chain from the door, as it was then quiet outside. Later Alan, who was unarmed, gained admission to Nuss' room and upon entering the room struck Nuss on the side of the face and stated that "I'm going to kill

you and I'm going to kill her." An altercation ensued and Alan, who was larger than Nuss, struck Nuss about the face, ears, temple, back of the head and neck, thereby knocking Nuss to his knees. Alan then started toward a night stand near the bed upon which a .357 Magnum revolver was laying in full view. Nuss jumped across the bed, reached the revolver before Alan, and threatened Alan with it, but the threats did not deter Alan in his determination to continue working on Nuss.

Nuss had the revolver loaded so that when the trigger was pulled the firing pin would strike an empty chamber and knowing this Nuss pointed the gun at Alan and pulled the trigger, the click of which halted Alan momentarily, but Alan again began the attack on Nuss who then fired two shots, purposely missing Alan with each of them. (The record discloses that Nuss was an expert marksman and gun collector and had some 30 guns which were in his motel room under a bed.) Nuss then cocked the revolver for a third shot but rested the hammer down, leaving the gun unfired. At this time Alan had retreated to the door of the room and Nuss testified he thought the altercation was over. However, Alan allegedly started back toward Nuss and Nuss fired a third shot, again purposely missing Alan. After this third shot Alan retreated into the hallway and Nuss moved to the doorway. Shortly thereafter Alan allegedly stopped and started back toward Nuss while uttering threats against him. Nuss then allegedly fired a fourth shot, striking Alan in front of his left ear and causing his death. Alan's body lay approximately ten feet from the door of Room 130, with blood spots on the sidewalk some few feet in length from the pool of blood left by Alan.

Immediately following the shooting Nuss placed the revolver on his dresser, went to the motel office where he was in tears, and requested someone to call the police and an ambulance.

The first issue raised by Nuss is that the evidence was not sufficient to uphold the verdict of the jury and that Nuss should

be discharged under the holding of *Banks* v. *State* (1971), 257 Ind. 530, 276 N.E.2d 155. Nuss points out that the defendant in *Banks* was discharged by our Supreme Court for the reason there was nothing in the record to indicate the evidential deficiency might be corrected upon a retrial, and insists that the same rule would be applicable to the case at bar and that Nuss should be freed by this court. Evidence was introduced at trial by the State of Indiana in an attempt to show Nuss did not act in self defense. Therefore, this raises an issue to be passed upon by the jury and on retrial if the same or similar evidence or additional evidence is presented by the State, and this would be an issue of fact to be determined by the jury on the retrial. On the other hand, if there was no evidence presented by the State the jury could possibly infer from Nuss' own testimony that his claim of self defense was not worthy of belief and their determination would not be disturbed on appeal for lack of sufficient evidence.

The offense of voluntary manslaughter is defined by IC 1971, 35-13-4-2, Ind. Ann. Stat. § 10-3405 (Burns Supp. 1974), as follows:

"Whoever voluntarily kills any human being without malice, express or implied, in a sudden heat, is guilty of voluntary manslaughter, and, on conviction, shall be imprisoned in the state prison for not less than two (2) nor more than twenty-one (21) years."

Thus, the essential elements of the crime of voluntary manslaughter are: (1) voluntary killing of a human being; (2) without malice; and (3) in sudden heat. *Fisher* v. *State* (1973), 259 Ind. 633, 291 N.E.2d 76; *Green* v. *State* (1957), 249 Ind. 86, 229 N.E.2d 726; *Ellis* v. *State* (1973), 159 Ind. App. 1, 304 N.E.2d 546.

While Nuss has argued that the State failed to show that he acted "in a sudden heat," it does not appear that such an omission amounts to reversible error as a matter of law. With respect to this point, Chief Judge Robertson, in *Hopkins*

v. *State* (1975), 163 Ind. App. 276, 323 N.E.2d 232, stated as follows:

"Historically, manslaughter has been treated as a lesser included offense of murder in this State, even after the manslaughter statute was bifurcated in 1969 to distinguish between voluntary and involuntary manslaughter. (Citations omitted.) The rule has been that if there is evidence which would support a conviction of murder in either degree, then the jury has the right to find the defendant guilty of voluntary (or involuntary) manslaughter as a lesser included offense, even in the absence of proof of 'sudden heat.' " 323 N.E.2d at 239.

Thus, the mere absence of evidence tending to prove provocation giving rise to "sudden heat" will not, as a matter of law, amount to reversible error.

However, a meritoriously asserted claim of self defense will be a legal justification of an otherwise criminal act. *Jennings* v. *State* (1974), 262 Ind. 476, 318 N.E.2d 358. The guidelines for this court's review of a claim of self defense, as established by the Indiana Supreme Court in *King* v. *State* (1968), 249 Ind. 699, 234 N.E.2d 465, are as follows:

"Where one has taken the life of another human being, and thereafter contends that he did so in self-defense, he can only be successful in his contention if:

(1) he acted without fault,

(2) he was in a place where he had a right to be, and

(3) he was in real danger of death or great bodily harm, or in such apparent danger as caused him in good faith to fear death or great bodily harm.

*Bullard* v. *State* (1964), 245 Ind. 190, 195 N.E.2d 856, 197 N.E.2d 295; *Hightire* v. *State* (1966), [247] Ind. [164], 213 N.E.2d 707. The burden is upon the State to show that defendant does not meet one or more of these requirements. *Dorak* v. *State* (1915), 183 Ind. 622, 109 N.E. 771. Whether the State has borne its burden of showing that the homicidal act was not carried out in self-defense is a question of ultimate fact

to be decided by the jury. *Robinson* v. *State* (1962), 243 Ind. 192, 184 N.E.2d 16.

After the jury has made this determination in favor of the State and against the defendant, this Court, on appeal: "* * * has upon it a duty to consider, not to weigh, the evidence in the case for the purpose of determining whether there is any substantial evidence of probative value from which a jury reasonably could have inferred that the appellant was guilty of the offense charged.' *Robinson* v. *State, supra,* 243 Ind. at 197, 184 N.E.2d at 18. See also *Easton* v. *State* (1967), [248] Ind. [338], 228 N.E.2d 6; *Baker* v. *State* (1956), 236 Ind. 55, 138 N.E.2d 641." 234 N.E.2d 468.

When a defendant makes a meritorious claim of self defense, the jury must view the situation from the defendant's perspective; however, this does not mean that the jury is required to believe the defendant's testimony regarding the alleged use of self defense. *Williams* v. *State* (1974), 262 Ind. 382, 316 N.E.2d 354; *Scruggs* v. *State* (1974), 161 Ind. App. 666, 317 N.E.2d 807. See also: *Patterson* v. *State* (1975), 263 Ind. 55, 324 N.E.2d 482; *Naugher* v. *State* (1974), 162 Ind. App. 611, 320 N.E.2d 757; *Woods* v. *State* (1974), 162 Ind. App. 316, 319 N.E.2d 688. When a defendant has successfully raised the issue of self defense, the State may either rebut it directly or rely upon the sufficiency of its evidence in chief. *Jennings, supra.* Whether the State's evidence is sufficient to rebut a claim of self defense is a question of ultimate fact to be decided by the trier of fact. *Scruggs, supra.*

In reviewing the record to determine if the conviction for voluntary manslaughter was sustained by sufficient evidence, this court will not weigh the evidence nor determine the credibility of the witnesses; instead, it will consider only that evidence most favorable to the State, together with all logical and reasonable inferences therefrom. *Kimble* v. *State* (1975), 262 Ind. 522, 319 N.E.2d 140; *Berry* v. *State* (1975), 162 Ind. App. 626, 321 N.E.2d 571; *Wheeler* v. *State* (1975) 163 Ind. App. 1, 321 N.E. 2d 233.

In this case, there is testimony of an eye witness that, if believed, would support a conviction of voluntary manslaughter. Donald Taylor testified that when he heard the initial shots he went to his motel window, saw decedent standing at least ten feet from Nuss, while facing the opposite direction, saw the gun pointed at the decedent, and finally saw the decedent as he was struck by the fatal bullet. The witness testified that at no time during this ten to thirty second interval did he see any movement by either the decedent or Nuss.

The second issue presented is that the trial court erred in giving the jury State's Instruction No. 10. Nuss contends that said instruction stated some of the elements of self defense incorrectly and omitted others completely.

Nuss tendered an instruction on self defense which was refused by the court. Timely written objections were filed by Nuss to State's Tendered Instruction No. 10, which were overruled, and Instruction No. 10 was read to the jury, and is in the words and figures as follows, to-wit:

"The State in this case, before conviction can be had, must prove beyond a reasonable doubt not only the fact that Alan Joy was killed by Barry Nuss, but must prove beyond a reasonable doubt that in killing Alan Joy, Barry Nuss was not acting in self-defense.

The defendant, Barry Nuss, insists that the acts charged in the indictment, in this case, if committed by him, were committed by him in self-defense, and this requires the court to instruct you as to the doctrine of self-defense.

One may kill another under such circumstances that the homicide constitutes no crime, but it is excused by the law. The doctrine of self-defense may be thus defined: Where a person, being without fault and in a place where he has a right to be, so far as his assailant is concerned, is violently assaulted, he may, without retreating, repel force by force. When, *from the acts of his assailant* he believes and has reasonable ground to believe, that he is in danger of losing his life, or receiving great bodily harm from his adversary, the right to defend himself from such danger or apparent danger may be exercised by him, and he may use it to any extent which is reasonably necessary, and if his assailant is killed as the result, from the reasonable

defense of himself, said killing *may be excusable*. The question of the existence of such danger at the time of the killing, the necessity or apparent necessity for the use of the force employed by the defendant, as well as the amount of force necessary to resist an attack, can only be determined from the standpoint of the defendant, at the time and under all existing circumstances.

A person must in the exercise of the right of self-defense, act honestly and conscientiously, and not from anger, malice or revenge. When all danger *and all apparent* danger of the loss of life, or of receiving great bodily harm from the assault of his assailant is at an end and passed, then his right to use force is at an end and should cease. The person exercising the right of self-defense must honestly believe and have reasonable ground to believe when he makes use of force to protect himself from an assailant, that at the time he uses the force or strikes a blow, it is then necessary to do so, to protect his life or person from great bodily harm.

The law demands that the force used to repel an assault must be reasonable, and be governed by the degree of danger existing at the time the force is used. *The use of deadly weapon is permitted only to protect life, or protect one from great bodily harm, and not to inflict punishment in a spirit of anger and revenge.* Any other interpretation of the law would permit one for a very slight injury or assault to take the law in his own hands, and kill his assailant, and then justify such killing on the grounds of self-defense." (Emphasis added.)

Nuss first challenges said instruction for the reason that it told the jury that the defendant must base the reasonableness of his claim of self defense upon only the *acts* of his assailant.

Nuss, in attempting to prove his actions prior to the shooting of Alan, offered evidence that Alan had made threats of bodily harm against Nuss to Alan's wife. The court ruled that Alan's wife's (Ella) testimony as to what Alan had said to her was hearsay and would not be admitted even if the threats were communicated to Nuss. The record discloses that some of the threats were communicated to Nuss by Ella. The court excluded threats made by Alan to Ella and communicated by her to Nuss the morning of the shooting. Other threats against Nuss which were not communicated to him, but to other parties, were similarly excluded by the court. The State argues that evidence of threats was

properly excluded as being hearsay and, further, that such evidence was merely cumulative in nature since there is other circumstantial evidence relating to Ella's activities after these conversations which bear on this same point and which were admitted into evidence.

In *Patterson* v. *State* (1975), 263 Ind. 55, 324 N.E.2d 482, Justice Prentice defined hearsay as:

> "(T) estimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted ▮ therein, *and thus resting for its value upon the credibility of the out-of-court assertor.*"

In *Harvey* v. *State* (1971), 256 Ind. 473, 269 N.E.2d 759, Justice DeBruler quoted with approval from Wigmore on Evidence as follows:

> "The theory of the Hearsay rule (*ante*, § 1361), is that when a human utterance is offered as evidence of the truth of the fact asserted in it, the credit of the assertor becomes the basis of our inference, and therefore the assertion can be received only when made upon the stand, subject to the test of cross-examination. *If, therefore, an extra-judicial utterance is offered, not as an assertion to evidence the matter asserted, but without reference to the truth of the matter asserted, the Hearsay rule does not apply.* The utterance is then merely not obnoxious to that rule. It may or may not be received, according as it has any relevancy in the case; but if it is not received, this is in no way due to the Hearsay rule.
>
> The prohibition of the Hearsay rule, then, does not apply to all words or utterances merely as such. If this fundamental principle is clearly realized, its application is a comparatively simple matter. *The Hearsay rule excludes extra-judicial utterances only when offered for a special purpose, namely, as assertions to evidence the truth of the matter asserted.*" (Emphasis added.)

Thus, if an extra-judicial utterance is offered, not as proof of the matter asserted therein, but as proof of the ▮ making of a statement, then such utterance is not barred by the hearsay rule.

Under this definition of the hearsay rule the testimony in question did not constitute inadmissible hearsay. The

statements were offered to show the reasonableness of Nuss' apprehension of harm at the hands of Alan. Nuss was not trying to show the truth of the matter asserted, i.e., the intentions of the deceased. He *was* trying to show what he, the defendant, believed to be the intentions of Alan.

In *Boyle* v. *State* (1884), 97 Ind. 322, the court said:

"As, in personal conflicts, every man is permitted, within reasonable limits, to act upon appearances and to determine for himself when he is in real danger, it would seem to follow as an inevitable consequence that whoever relies upon appearances, and a reasonable determination upon such appearances, as a defense in a case of homicide, ought to be allowed to prove every fact and circumstance known to him and connected with the deceased which was fairly calculated to create an apprehension for his own safety. Any narrower rule than this would, we think, prove inadequate to full justice in all cases of homicide, and would, in many cases, operate as a serious abridgment of the law of self-defense." 97 Ind. at 326.

It is further the rule that where the issue of self defense is presented by the evidence in a homicide prosecution, evidence of the deceased's *uncommunicated* threats is admissible for the purpose of showing his intention, motive, disposition, or state of mind toward the defendant. *Holler* v. *State* (1871), 37 Ind. 57; *Ellis* v. *State* (1898), 152 Ind. 326, 52 N.E. 82; *Howe* v. *State* (1917), 186 Ind. 139, 115 N.E. 81. Thus, it was error to exclude any such testimony as violating the hearsay rule.

The State argued that such testimony was merely cumulative and without relevance to the issues of the case.

The excluded testimony would have tended to corroborate part of the testimony of Nuss. Thus, while the evidence in question might have been cumulative, it was extremely critical to Nuss' defense. This is in accordance with the view that the propriety of the trial court's admission or exclusion of corroborating evidence must depend upon the status of the evidence which it tends to corroborate. *Harvey, supra.* In view of the fact that Nuss' credibility was of utmost importance to his defense, the wrongful exclusion of any evidence

which would tend to corroborate his testimony or lend credence to his defense would not be without prejudice to his substantial rights.

It is our further opinion that Nuss was entitled to present to the jury the evidence that Alan was a user of drugs and that when under the influence of drugs he committed acts of violence. Certainly, the jury was entitled to know this in determining whether or not Nuss was justified in using the force he used in self defense. It would be immaterial to the issues in this case if Alan had or had not been under the influence of drugs at the time, as the issue was whether Nuss thought he might have been and therefore more violent and more dangerous and there was more need to use the force which was used to protect himself and save his life from the aggressions of Alan.

Nuss next challenges said instruction wherein it states that one can only defend himself against "violent" assault.

Instruction No. 10 tells the jury that when a person, being without fault and in a place where he has a right to be, so far as his assailant is concerned, is *violently* assaulted, he may, without retreating, repel force by force.

The law is well settled that a defendant may defend against all assaults, as set forth in the instruction in *Brown* v. *State* (1971), 255 Ind. 594, 265 N.E.2d 699, which was approved by our Supreme Court and later approved by this court in *Woods* v. *State* (1974), 162 Ind. App. 316, 319 N.E.2d 688. He may use the force he believes necessary even though, by hindsight, it appears that there was no danger at all. *Heglin* v. *State* (1957), 236 Ind. 350, 140 N.E.2d 98. The use of a deadly weapon is not as restricted as is set out in the last paragraph of Instruction No. 10. Our Supreme Court spoke of the use of a deadly weapon in *Davis* v. *State* (1898), 152 Ind. 34, 38, 51 N.E. 928, 929.

Nuss further claims the trial court erred by stating that if the jury finds that the defendant killed in self defense, it "may" be excusable.

The "is excusable" or "is justifiable" language has been repeatedly used by the Indiana Supreme Court in defining the doctrine of self defense. *Banks* v. *State* (1971), 257 Ind. 530, 276 N.E.2d 155; *Bange* v. *State* (1958), 237 Ind. 422, 146 N.E.2d 811; *Flick* v. *State* (1935), 207 Ind. 473, 193 N.E. 603; *Myers* v. *State* (1922), 192 Ind. 592, 137 N.E. 547. The Supreme Court's usage of the "is excusable" or "is justifiable" language, rather than the "may be excusable" or "may be justifiable" language, is consistent with the view that a meritoriously asserted claim of self defense is an absolute defense to a criminal prosecution. *Jennings* v. *State* (1974), 262 Ind. 476, 318 N.E.2d 358; IC 1971, 35-13-10-1, Ind. Ann. Stat. § 9-2412 (Burns Supp. 1974).

This part of the instruction merely informed the jury that a killing in self defense "may be excusable" and impliedly this instruction informed the jury that a killing in self defense may *not* always be excusable. *Mundy* v. *State* (1966), 247 Ind. 224, 214 N.E.2d 389; IC 1971, 35-1-47-9, Ind. Ann. Stat. § 9-2320 (Burns 1956); Ind. Rules of Procedure, Trial Rule 61; CR. 21.

Thus, the trial court committed reversible error in excluding the evidence in question and also committed reversible error in reading to the jury State's Tendered Instruction No. 10.

Reversed and remanded to the trial court for a new trial.

Robertson, C.J. and Lybrook, J., concur.

NOTE.—Reported at 328 N.E.2d 747.