CHARLES LESTER GREGG *v.* STATE OF INDIANA.

[No. 1-675A99. Filed November 30, 1976. Rehearing denied January 19, 1977. Transfer denied April 15, 1977.]

364

*John T. Manning,* of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *John P. Avery,* Deputy Attorney General, for appellee.

## STATEMENT OF THE CASE:

LOWDERMILK, J. — Defendant-appellant, Charles Lester Gregg (Gregg) was charged in separate informations with having committed the crimes of assault and battery with intent to kill both Jack and Margie Petty.[1] Judgment was entered on the jury's verdicts of guilty of aggravated assault as to Jack Petty (Jack), and guilty of simple assault and battery as to Margie Petty (Margie). Following the trial court's overruling of Gregg's belated motion to correct errors[2] this appeal was perfected.

We affirm.

## FACTS:

The facts necessary for our disposition of this appeal are as follows: On May 29, 1974, Jack went to the home of Gregg to recover a wallet belonging to his son which Gregg had found on his property. Upon Gregg's refusal to return the wallet, Jack and Gregg engaged in a heated exchange of words, resulting in Gregg rushing into his house.

Shortly thereafter, Gregg came out of his house armed with a pistol. Mrs. Gregg then told Jack "that he had better leave because Mr. Gregg had a pistol." The Greggs testified that at this point Jack exclaimed "I've got one too." The Pettys deny that this statement was made.

Jack then moved first to the passenger side of his car. Next, he moved around his car to the driver's side. At this point, Gregg sprang from his position by his work bench in his yard to the passenger side of Jack's car. Gregg then shot Jack who was standing on the other side of his car in the arm or shoulder. Gregg then shot Margie in the back of the

1. IC 1971, 35-13-2-1 (Burns Code Ed.).
2. Ind. Rules of Procedure, Post Conviction Rule 2.

head. She was sitting in the front seat on the passenger's side of her husband's car. Gregg then shot Jack once more in the back as he was running across the street.

## ISSUES:

1. Whether Gregg was proven sane beyond a reasonable doubt.

2. Whether the trial court's instruction on self-defense was erroneous.

3. Whether the jury's verdict is inconsistent.

4. Whether the trial court erred in excluding testimony of defense witness Myrtle Hickman who would have testified she heard a voice from the direction of Gregg's property say "I've got one too."

## DISCUSSION AND DECISION:

### ISSUE I:

Gregg contends that the State failed to prove his sanity beyond a reasonable doubt. He argues that immediately after he shot Jack in the shoulder he blanked out and could not remember anything else that happened until he regained his powers of recollection sometime after he had been taken into police custody. Gregg points out that neither expert appointed by the court[3] could render an opinion as to whether he was sane at the time of the shootings. Dr. Vance testified that he would need time to conduct additional psychiatric tests before he could make a judgment as to Gregg's sanity at

---

3. IC 1971, 35-5-2-2 (Burns Code Ed.) provides in pertinent part the following:

". . . When an insanity defense is pleaded, the court shall appoint two [2], or three [3], competent disinterested physicians to examine the defendant, and to testify at the trial. Such testimony shall follow the presentation of the evidence for the prosecution and for the defense, including testimony of medical experts employed by the state and by the defense, if any. The medical witnesses appointed by the court may be cross-examined by both the prosecution and the defense, and each side may introduce evidence in rebuttal to the testimony of such medical witnesses. . . ."

the time of the shootings. Gregg continues by arguing that he was entitled to have expert testimony and to an expert opinion on the matter of his sanity. If not, the doubts as to his sanity held by the psychiatrists were binding on the jury.

When a criminal defendant raises the defense of insanity, the burden rests upon the State to prove the defendant's sanity beyond a reasonable doubt. *Riggs* v. *State* (1976), 264 Ind. 263, 342 N.E.2d 838, 841; *Brattain* v. *State* (1945), 223 Ind. 489, 61 N.E.2d 462.

The State need not rely upon expert testimony to meet its burden of proof. *Feller* v. *State* (1976), 264 Ind. 541, 348 N.E.2d 8. The question of a defendant's sanity is one to be resolved by the trier of fact. *Riggs, supra,* at page 841. The trier of fact is free to look at all relevant evidence on the issue of a defendant's sanity, including the testimony of laymen and the acts surrounding the crime itself. *Stamper* v. *State* (1973), 260 Ind. 211, 294 N.E.2d 609; *Fitch* v. *State* (1974), 160 Ind. App. 697, 313 N.E. 2d 548.

When reviewing the sufficiency of the State's evidence this court will neither weigh the evidence nor judge the credibility of witnesses. *Wilson* v. *State* (1975), 263 Ind. 469, 333 N.E.2d 755. Rather, we will look to the evidence most favorable to the State and the reasonable inferences to be drawn therefrom. When there is substantial evidence of probative value to support the verdict of the trier of fact the judgment of the trial court will be affirmed. *Riggs, supra,* at page 841 and cases cited therein.

The evidence most favorable to the State reveals that following an argument over a wallet, Gregg went into his house, emerged with a gun, and shot Jack in the arm or shoulder. Gregg then pointed the gun at Margie and exclaimed "I might as well give you some of it too," and then shot her in the back of the head. Gregg then shot Jack a second time in the back

as he was running across the street. Gregg's wife testified that immediately preceding this last shot she heard her husband say "you coward."

After the shooting, Gregg went back into his house and called the police. Shortly thereafter he called the police again and requested an ambulance. Next, Gregg called his attorney and said "Bob, I'm in trouble, I'm going to be needing you" and "I'll see you at headquarters."

The record discloses that Gregg made the following statement to Officer Donald E. Bingham while in custody at the police station:

"* * *

Q. What were these statements?
A. He had said something about he had found a billfold of Mr. Petty's son below his window—sometime during the winter. And—he also stated that Mr. Petty had come over to the house and he advised him that—to leave—several times. And—he also stated that Mr. Petty had said 'I'm going to get my gun' and left—and went to the car, leaned inside—and—he come out of the car—Mr.—he said he thought Mr. Petty had something and he shot—and thought he had missed—and—he said that at that time Mrs. Petty grabbed the gun and a shot went off. And—that's all, I guess.

Q. Okay. He stated that—that Mrs. Petty grabbed the gun?
A. Yes, sir.

Q. Did he say anything about a third shot that was fired?
A. No, sir.
* * *"

In *Stamper, supra,* our Supreme Court stated at page 611:
"Appellant takes the position that the State failed in this burden because the two psychiatrists appointed by the court to examine the appellant filed separate reports, each stating that they were of the opinion that the appellant was under such stress at the time of the killing that he was unable to control his emotions and actions and at that time was of unsound mind. *However, the reports of these doctors did not constitute the sole evidence submitted to the jury for their determination as to the appellant's sanity*

*at the time of the killing.* Police officers testified that when they talked to the appellant after he had discovered his wife's death and before the death of Kerins, he had calmed down and was showing no indication of hysteria. There is also evidence from which the jury could conclude that appellant's past behavior had indicated that he was a man with a violent temper, and he had previously attacked persons including his wife and had previously threatened to kill Kerins. There was evidence from which the jury could determine that the appellant was merely giving vent to his violent temper when he attacked and killed Kerins, rather than being the victim of temporary insanity. *We have repeatedly held that it is within the province of the jury to determine the fact of the sanity of the appellant at the time in question, and that they may accept or reject the statements of any of the witnesses in that regard including psychiatrists. So long as there is evidence to support the issue of sanity for which the State bears the burden of proof, this Court will not disturb their verdict. Twomey* v. *State* (1971), [256] Ind. [128], 267 N.E.2d 176, 24 Ind. Dec. 713." (Our emphasis.)

We are of the opinion that the evidence as outlined above, when viewed most favorably to the State, was sufficient to allow the jury to find Gregg sane at the time he shot Jack and Margie Petty.

Under. this assignment of error, Gregg also argues in his brief that he was denied due process of law under the Fourteenth Amendment to the United States Constitution because the trial court did not, *sua sponte,* continue the trial when the court appointed experts were unable to give a definitive opinion on his sanity as of the time of the shootings.

We note that neither of Gregg's contentions were specifically set out in his belated motion to correct errors. Further, at trial, he neither objected nor moved the court to continue the trial for the purpose of allowing the expert additional time within which to conduct tests. Having failed to have done so, the alleged errors, if any, were waived for purposes of appellate review. Indiana Rules of Procedure, Trial Rule 59 (B) (G) ; *Hurst* v. *Hurst* (1975), 166

Ind. App. 243, 335 N.E.2d 245; *Dudley Sports Co., Inc.* v. *Schmitt* (1972), 151 Ind. App. 217, 279 N.E.2d 266.

Although Gregg waived the claimed error we believe it to be of sufficient import to write on it.

We are of the opinion that the trial court *did not err* in failing *sua sponte* to grant a continuance when the court appointed experts failed to render a definitive opinion on the specific question of whether Gregg was sane at the time he allegedly committed the crimes of which he was charged.

In *James* v. *State* (1974), 261 Ind. 495, 307 N.E.2d 59, our Supreme Court therein at page 61 stated:

". . . Although the medical experts failed to testify with specificity concerning the defendant's power of will to resist an impulse to commit the homicide, they both concluded their testimony with their opinion that he was legally sane at the time of the offense. Even without this testimony, however, or even if the medical testimony had supported the defendant's contention that he acted under an irresistible impulse, the jury was justified, from the other evidence, in concluding that such was not the fact. The ultimate determination of legal sanity was to be made by the jury from all the evidence of probative value. . . .

The following language from *United States* v. *Freeman* (2d Cir. 1966), 357 F. 2d 606, 619, quoted by this Court in *Hill* v. *State* (1969), 252 Ind. 601, 617, 251 N.E.2d 429, 438 explains the responsibility of the jury in such matters.

"* * * At bottom, the determination whether a man is or is not held responsible for his conduct is not a medical but a legal, social or moral judgment. Ideally, psychiatrists—much like experts in other fields—should provide grist for the legal mill, should furnish the raw data upon which the legal judgment is based. It is the psychiatrist who informs as to the mental state of the accused—his characteristics, his potentialities, his capabilities. *But once this information is disclosed, it is society as a whole, represented by judge or jury, which decides whether a man with the characteristics described should or should not be held accountable for his acts.* In so deciding, it cannot be presumed that juries will check their common sense at the courtroom door. (our empha-

sis) *United States* v. *Freeman, supra,* 357 F. 2d p. 619-620.' " (Original emphasis.)

We are of the opinion that the underlying purpose of IC 1971, 35-5-2-2, *supra,* was met in the case at bar, and there was no infringement of Gregg's constitutional rights.

The record discloses that although the two court appointed experts were unable to give a definitive opinion on the issue of Gregg's sanity at the point in time when the crime was committed; nevertheless, during cross-examination, both parties elicited substantial testimony for the jury to consider on Gregg's mental condition in general.[4] We believe that this was just the type of "raw data" spoken of in *James, supra,* which a jury should properly have before it and consider in making its difficult decision of whether a criminal defendant was sane at the time he allegedly committed a criminal act.

Additionally, it should be noted that IC 1971, 35-5-2-2, *supra,* fully protects a criminal defendant's right to call expert witnesses of his own choosing to rebut the testimony of court appointed experts which tends to be unfavorable to his defense of insanity. The record discloses that Gregg fully understood the nature of this right. On August 21, 1974, Gregg petitioned the court to allow him to be examined by his retained psychiatrist, Dr. David M. Crane, which petition was granted on August 26, 1974. The results of this examination, if an examination were made by Dr. Crane, were not introduced into evidence at Gregg's trial.

The court was at a great disadvantage to know whether to recess the trial or grant a continuance, *sua sponte,* as counsel for Gregg may have had knowledge which prompted him to do as he did in the best interests of Gregg and counsel did not desire more psychiatric evidence after a further examination. Counsel may have, in his better judgment, deemed it expedient for Gregg to "let a sleeping dog lie."

---

4. The record discloses no less than 55 pages of testimony from the court appointed experts on Gregg's general state of mental health.

## ISSUE II:

Gregg next contends that the trial court's amended instruction on self-defense was erroneous. The record discloses that Gregg failed to object to the trial court's giving to the jury his final instruction, as amended by the court, on self-defense. A party must object to the giving of an instruction before the jury retires to consider its verdict, or the error, if any, is waived. TR. 51(C); *McDonald* v. *State* (1976), 264 Ind. 477, 346 N.E.2d 569; *Chicago South Shore & South Bend Railroad* v. *Brown* (1975), Ind. App., 323 N.E.2d 681.

## ISSUE III:

Gregg next contends that the jury's verdicts were inconsistent. He argues that since the shootings were close together in time and space, the jury should have returned verdicts of guilty of simple assault and battery as to both Margie and Jack Petty.

Gregg was charged in two informations with having committed the crimes of assault and battery with intent to kill both Jack and Margie Petty. Although the criminal acts were close together in time and space, Gregg perpetrated two distinct crimes. Both aggravated assault and battery, if bodily injury is alleged, and simple assault are lesser included offenses of assault and battery with intent to kill. *Thomas* v. *State* (1970), 254 Ind. 600, 261 N.E.2d 588; *Young* v. *State* (1967), 249 Ind. 286, 231 N.E.2d 797. A criminal defendant charged in separate informations of committing two distinct crimes has no cause to complain if the jury should return a verdict of guilty of proper lesser included offenses.

## ISSUE IV:

Gregg argues that it was error for the trial court to exclude as hearsay the testimony of Myrtle Hickman that she heard a voice from the direction of Gregg's property say

"I've got one too." Gregg's offer to prove also tended to show that Myrtle would have testified that the voice she heard was not Gregg's. Therefore, Gregg's argument continues, that since Jack and he were apparently the only two people in the vicinity shouting at each other it would be logical for the jury to infer that it was Jack who made the statement. The excluded statement would therefore have lent credence to the "reasonableness" of his belief that Jack was about to inflict death or great bodily harm upon him.

We are of the opinion that the trial court erred in excluding the above testimony. *Nuss* v. *State* (1975), 164 Ind. App. 396, 328 N.E.2d 747. In light of the facts and circumstances surrounding the case at bar, such error was harmless and does not require a reversal.

In the case of *Brown* v. *State* (1972), 258 Ind. 412, 281 N.E.2d 801 at 802, our Supreme Court said:

". . . However, in the case at bar, although the statement by the officer was improper, we hold that it is not reversible error under the circumstances of this case." See also, *Dillard* v. *State* (1971), 257 Ind. 282, 274 N.E.2d 387; *Moore* v. *State* (1972), 258 Ind. 200, 280 N.E.2d 57; *Moreno* v. *State* (1975), 166 Ind. App. 441, 336 N.E.2d 675; Ind. Rules of Procedure, Trial Rule 61.

As was true in *Nuss, supra,* the statement "I've got one too," was not offered to show the truth of the matter asserted, i.e., the intentions of Jack. Rather, the statement was offered to show the reasonableness of Gregg's belief that Jack was about to inflict bodily harm upon him. Such testimony being relevant to Gregg's claim of self-defense, it was error for the trial court to have excluded it.

However, we are of the opinion that there was sufficient evidence for the jury to convict Gregg even though the testimony was excluded.

The record revealed that Gregg shot Jack not once, but twice, following the purported statement made by Jack of "I've got one too." In between these shots, Gregg shot Jack's

wife, Margie. The first shot struck Jack in the arm or shoulder. The second shot struck Margie in the back of the head. The third shot struck Jack in the back as he was running across the street from Gregg. Before Jack was struck the second time while running across the street, Gregg was heard to say, "You coward." We do not understand Gregg to argue that he shot either Margie, or Jack in the back while running away from him, in self-defense.

Our Supreme Court has expressed their sentiments about such an argument in *White* v. *State* (1968), 251 Ind. 100, 239 N.E.2d 577, wherein, at pp. 578-79 it was said:

> "It may have been proper for the appellant to arm himself after the threat by the deceased, and it may have been proper for the defendant to have fired the first shot acting in self defense. When, however, the deceased dropped his shotgun by his car, where it was found later, and ran unarmed away from the defendant and the defendant shot him in the back of the head while he was fleeing, the defendant was not acting in self defense at that time.
> 'One cannot, after his enemy has cast his weapon, and turned to fly, kill him, and successfully claim to have been acting in self defense. This also disposes of the claim that the evidence is not sufficient to sustain the verdict.' *Meurer* v. *State* (1891), 129 Ind. 587, 589, 29 N.E.2d 392."

Rather, Gregg argues that because of a pre-existing head injury he blanked out, and was unable to recall anything that happened after he fired the first shot at Jack. As we have stated above, the issue of Gregg's sanity or insanity was one to be resolved by the trier of fact. *Riggs* and *Stamper, supra*. This issue was resolved adversely to Gregg. Therefore, even if the excluded testimony had been admitted into evidence, we are of the opinion that there was sufficient evidence for the jury to find that Gregg did not shoot Margie in the head, or Jack in the back while fleeing, in self-defense.

Judgment affirmed.

Robertson, C.J., and Lybrook, J., concur.

NOTE.—Reported at 356 N.E.2d 1384.