(No. 24398

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HARRY RENICK, Plaintiff in Error.

*Opinion filed April 15, 1938.*

CLYDE C. FISHER, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, BLAIR L. VARNES, and MELVIN S. REMBE, of counsel,) for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Harry Renick was convicted by a jury in the criminal court of Cook county of the murder of Andrew B. Johnson. His punishment was fixed at fourteen years in the penitentiary.

Johnson was shot and killed in a tavern on Addison street, in Chicago, on the night of February 14, 1937. A mortgage on certain property owned by Renick had been foreclosed, and pursuant to a court order he was evicted on January 30, 1937. Johnson was the agent of the re-

ceiver of the premises. On the night before the killing Renick and Johnson had an encounter at the tavern over the eviction. Renick testified that Johnson told him he had gotten him out and was going to keep him out, and that he told Johnson he did not want to argue or talk with him about it and to get away and leave him alone; that Johnson persisted and he, Renick, slapped him; that Johnson called him a son-of-a-bitch and asked him to go outside; and that as they went out the door Johnson shot him in the eyes with a tear-gas gun, temporarily blinding him. On the night of the homicide Johnson, his brother, Inar Burgeson and two friends, Mr. and Mrs. Carl Peterson, were drinking at the bar. Renick entered and took a seat at the far end of the bar about fifteen feet from them. He had a revolver in his pocket which, he testified, he had put there on the previous Friday night for protection while watching his furniture which had been piled on the sidewalk following his eviction.

Renick at no time approached Johnson, Burgeson or Peterson, but remained at the far end of the bar where he went when he entered the tavern. Johnson went back to where Renick was seated at least twice. When he first went back Renick said he wanted nothing to do with him and told him to get away. Mrs. Peterson induced Johnson to go back to their party, and Burgeson ordered drinks for all of them, including Renick. Some time later a second altercation occurred, at the culmination of which the fatal shot was fired.

Burgeson, Peterson and Mrs. Peterson testified that Johnson was alone when he approached Renick the first time. Burgeson testified that he was not near Renick when the shot was fired, but seized him afterwards in order to get the gun away from him. Peterson testified that he was drinking at the bar at the time he heard the shot, but did not turn around because he was not expecting anything, and paid no attention to it, and a few minutes later saw

Johnson lying on the floor. Mrs. Peterson testified that after the first altercation, she went to a wash room in the rear of the dance hall next to the barroom and did not hear the shot; that upon her return, as she entered the arch which connects the two rooms, Johnson was swaying in front of her and fell on his face, and that her husband did not in any way touch Renick.

Renick testified that Johnson approached him and said they had come there to clean him up; that this was accompanied by similar threats from Burgeson and Peterson, who followed Johnson to where Renick was sitting; that Renick told them to go away and let him alone; that he did not want any trouble with them or to talk to them; that they then went back to the bar; that sometime later the three men came back and he saw they meant to jump on him; that he drew his gun to scare them and told them: "I am going out of here;" that all three men grappled with him; that in the struggle he changed the gun to his left hand and was holding it around the cylinder; that Burgeson reached over and took hold of the butt of the gun, trying to twist the muzzle into Renick's stomach; that Johnson was trying to hit him over the head with an empty beer bottle; that the bartender, Marten, grasped him from behind, and in the struggle the gun was discharged, killing Johnson.

Leo Marten, the bartender, testified that Burgeson and Johnson both accosted Renick soon after he entered the tavern; that Renick told them to leave him alone and that he did not want to talk to them; that at Marten's request Mrs. Peterson interfered and induced Burgeson and Peterson to return to the bar; that Burgeson then ordered drinks; the witness asked Renick what he would have, to which Renick replied he would take a small beer; that as he was drawing the beer, the three men went back to Renick and renewed the altercation; that Renick told them to leave him alone, the court would take care of things to-morrow; that he drew his gun and backed up six feet; that the witness

told Renick not to be a fool and ran around the end of the bar and grabbed for the gun; and that in the meantime Johnson, Burgeson and Peterson closed in on Renick, and the gun was discharged in the struggle. During the examination of Marten it developed that a signed statement made by him at the police station where he was held in custody on the morning after the shooting, differed from his testimony on the trial. His signed statement indicated he heard the shot as he came around the bar and that the struggle took place after the shot was fired. The State's attorney claimed surprise and was permitted to cross-examine him. Marten testified that when he made his statement at the police station he was asked to tell the story briefly, and that he made the statement as he did because he was afraid Renick might try to involve him in the killing, but when Renick admitted the shooting, he changed his testimony and told the whole story at the inquest. He reaffirmed his earlier testimony, which was substantially the same as at the coroner's inquest.

Edward Frolich, a witness for the People, testified that after the first altercation he walked toward the front of the bar, and that he was on his way to the toilet. Just why he would go toward the front of the bar to reach a toilet in the rear is not made to appear. He also testified that when the shot was fired Peterson and his wife were standing in the archway between the rooms. This does not agree with Peterson's story that he was drinking at the bar, or with Mrs. Peterson's testimony that she was in the wash room and did not hear the shot.

The court refused to permit Renick's physician to testify to his physical condition. Defendant offered to prove by the witness that he had been under the physician's care approximately two years for a heart ailment consisting of dilation of the blood vessels and anurism, and that the doctor prescribed rest, quiet and avoidance of any violent physical exercise or work of any kind. During the colloquy the

court said: "From what I observe your defense is going to be that he shot in self-defense," and later said: "The court sustains the objection and you will desist from further examination along the same lines that you have heretofore indulged in." Prior to this, Burgeson was asked, referring to the time of the homicide, if he did not know that Renick had·been at least four times in the Cook county hospitals. An objection was sustained to the question. On the question of self-defense it was proper to show Renick's physical condition and whether Burgeson knew of it. It was prejudicial error to exclude it. *People* v. *Rappaport,* 362 Ill. 462; Wharton on Crim. Evidence, (11th ed.) sec. 328.

The testimony shows defendant was 61 years old, wore glasses and weighed 140 pounds. Burgeson was 39 years old, weighed 145 pounds and was 5 feet 7 inches tall. Johnson was two inches shorter and weighed 140 pounds. Peterson weighed 200 pounds. The court refused defendant's offered instruction that "In deciding whether the defendant was justified as a reasonable man in believing he was in great bodily danger from the deceased and the three other men with him, at the time and place in question, you have the right to consider the age, size, condition of health and strength of the defendant as compared to that of the other three men there, and the situation in the rear of the building in which the defendant was, at and just before the shooting, so far as the same appear in evidence, together with all the other facts and circumstances then surrounding him in evidence in the case." While the court gave instructions which told the jury that if the circumstances are such as to induce in the accused a reasonable and well grounded belief that he is actually in present danger of losing his life or receiving great bodily harm, then acting on such belief he will be justified in defending himself whether the danger is real or only apparent, and that the fear which a person may act upon is the fear of a reasonable person excited by the surrounding circumstances, no instruction covering the

matters in the offered instruction was given. The elements mentioned in the instruction were proper to be considered by the jury and defendant was entitled to have them submitted to it. The instruction should have been given.

The court also refused his offered instruction that "If from the evidence or lack of evidence, you have a reasonable doubt in this case as to whether or not the defendant fired the shot in self-defense, or that the shot was fired accidentally by the defendant, or some one else, or if under the evidence you are unable to say who actually pulled the trigger that fired the shot in question, or whether it was done accidentally by the defendant, or by some one else, as defined by these instructions, then you should find the defendant not guilty of murder." If defendant's story of the shooting be true his hand was not in a position to pull the trigger when the shot was fired. He was entitled to have instructions given concerning any state of facts which the jury might legitimately find to have been proved by the evidence. (*People* v. *Doody*, 343 Ill. 194; *People* v. *Egan*, 331 id. 489.) The denial of this instruction deprived him of that right.

The undisputed facts show that defendant at no time approached Johnson, Peterson or Burgeson, or sought any controversy with any of them, but tried to avoid any altercation with them. From the time he came into the tavern he did not address any of them except during the quarrels they forced upon him. It may be assumed that any man might reasonably fear great bodily harm from an assault by three others of the weight and build of Johnson, Peterson and Burgeson. He testified that he drew his gun only to scare them so that he might escape.

The testimony of the witnesses for the prosecution is not of that clear, convincing character that excludes a reasonable doubt as to the guilt of the defendant. The judgment of the criminal court is reversed.

*Judgment reversed.*