JAMES GUNN, JR. *v.* STATE OF INDIANA

[No. 2-1075A262. Filed August 3, 1977.]

*A.S. Woolbert,* of Anderson, *Frank E. Spencer,* of Indianapolis, for appellant.

*Theodore L. Sendak*, Attorney General, *Elmer Lloyd Whitmer*, Deputy Attorney General, for appellee.

ROBERTSON, C. J. — James Gunn, Jr. (Gunn) was charged by indictment with murder in the first degree. The jury returned a verdict of guilty of involuntary manslaughter, and he was sentenced to the custody of the Indiana Department of Corrections for a term of one to ten years. Following the overruling of his motion to correct errors, he perfected this appeal.

We reverse and remand for a new trial.

The evidence describing the events of the early morning of Friday, November 3, 1973, is generally uncontradicted.

Soon after Gunn met Henrietta Jackson (Jackson) in April, 1973, they were in love. Three weeks before the homicide, they broke up when Jackson accused Gunn of having another girlfriend. After two weeks, however, they were back together. On November 2, 1973, while Gunn was at the El Morroco Bar, Jackson came in and tried to give Gunn the keys to the 1967 Cadillac (a gift he had bought for her) to take her for a drive. When Gunn told her to keep them, she became angry. Ragland, who had been sitting with Gunn when she came in, heard her remark that "He was going to make her hurt him." Gunn became frightened when he saw her holding her .25 automatic. He previously had tried to persuade her to get rid of it. He left the table to collect himself, and to let her cool down. He then returned and made a date to meet her later at the Oasis Bar.

About midnight, Gunn went to the Oasis. When Jackson arrived at about 12:45 A.M., she walked past Gunn and his friends as if she was angry, and sat at a booth where Gunn joined her. Several witnesses heard her swearing, though no one heard Gunn raise his voice. Later, when Gunn was returning to their table from the restroom, he stopped to talk with friends. He returned to Jackson, who was again angry because he had been talking with some girls. Finally, looking disgusted, Gunn got up from their booth and left. Jackson followed him out the door. She wanted to talk, so they drove in his car to her home. Gunn testified:

"A.   When we get down there she started just really argu-
     ing, real fearse [sic] . . . So I told her that is it, I'm
     through, I can't take anymore, I'm through with you,
     you know. I said I'll take you back up and you get your
     car, cause I don't want to have no more arguments, I'm
     tired of arguing."

Across the street from the Oasis, she got out of his car. She asked
if this was really it. Then Gunn saw the gun in her right hand. He
slid across the passenger side and got out. He told her to give him
the gun, which she did. He took the clip out and emptied the bullets
into his pocket. She reached into her purse, then pulled out another
bullet, which he requested she also turn over, and she complied.

A.   Then she asked me where I was going and I told her I
     was going to park and go back in the Oasis. She said not
     with her gun, she was taking her gun back.

Q.   What did you say?

A.   I told her no, she wasn't going to have it.

Q.   What did she do?

A.   I still had it in my right hand, she grabbed my right
     hand and we scuffled for it. Upon the sidewalk — after
     we got up on the gravel she just gave one big lunge, I
     felt it when the gun hit on her neck.

Q.   What happened?

A.   It went off.

Gunn testified that he was shocked and afraid and thought of
suicide, so he threw the gun down. He drove to meet his brother,
and they decided he should turn himself in to the police.

After being advised of his Miranda rights and signing a waiver
form, he told the Anderson police officers that he accidentally
shot Jackson. A detective of the Anderson Police Department, a
witness for the State, testified that Gunn also said that Jackson
pulled a knife on him. When Gunn asked if a knife was found, he
was told that a knife was buried under other articles in her purse.
Gunn testified that when she reached into her purse before the
scuffle over the gun, he thought she reached for her knife and he

was frightened. He knew she always carried the knife, and he had seen her use it on the brother of an ex-boyfriend shortly after they met.

The State presented one witness who testified that he had glanced from a distance, while walking by, and had seen that two people with their backs to him were having a little scuffle. Patrons at the Oasis rushed outside after the shot was fired, and saw Jackson lying on the gravel parking lot about fifty feet from the Oasis.

Jackson's clothing was not torn, and there were no signs of external force on her person except the bullet wound. Gunn had some slight scratches on his hands and forearms. One shell casing was found on the ground at the scene, but the gun was never found.

Gunn contends that the trial court committed reversible error by refusing to admit into evidence Defendant's exhibit 1[2] which supported a theory of self-defense. The court found this defense to be inconsistent with the theory, also put forth by Gunn, that the gun discharged accidentally.

We agree with Gunn that the trial court erred when it refused to allow him the opportunity to pursue a theory of self-defense and to submit relevant supporting evidence and that the existence of facts to support a finding of self-defense is to be decided by the jury.

Gunn was permitted to initiate an evidentiary presentation of his accident defense. In general, a homicide may be completely excusable when it is the result of accident or misadventure. 40

---

2. Exhibit 1 is an unsigned letter dated October 10, 1973, and addressed to Charles Gunn, the defendant's brother. Jackson's name appears in the return address on the envelope. In it, she wrote:

"I am going to fixed your brother up real, real good . . . he next on the list so don't be made at me I bought me a .38 pistol just for him and him only . . . I already got a good lawyer so I'll get out of it anyway just took some money to the bank for bond money . . . this is something I must do Michael Smith told me all that happen I can't let Gunn do me like that . . .

Don't be mad at me I am sorry forgive me Charles I loved your brother very, very, it still hurt's but he's going to pay the cost just like she's did only more."

Evidence of a threat made by the deceased against the defendant is relevant under a theory of self-defense to show the reasonableness of the defendant's apprehension of harm. *Nuss v. State* (1975), 164 Ind. App. 396, 328 N.E.2d 747.

Am.Jr.2d *Homicide* §§ 110, 112 (1968); 1 Wharton's Criminal Law and Procedure, §§ 211, 212, p. 463, 464 (1957). Although this defense is recognized in Indiana, *Butler v. State* (1967), 249 Ind. 484, 229 N.E.2d 471; *Fausett v. State* (1942), 219 Ind. 500, 39 N.E.2d 728; *Lloyd v. State* (1934), 206 Ind. 359, 189 N.E. 406; *Weston v. State* (1906), 167 Ind. 324, 78 N.E. 1014; *Potter v. State* (1904), 162 Ind. 213, 70 N.E. 129, we find no Indiana cases which explicitly treat the accident or misadventure defense theory.

From a review of decisions in Indiana and other jurisdictions, we determine that the defense of homicide by accident or misadventure includes three elements:

1. The killing must be unintentional, or without unlawful intent or evil design on the part of the accused,

2. the act resulting in death must not be an unlawful act,

3. nor an act done recklessly, carelessly or in wanton disregard of the consequences.

*Commonwealth v. Pavillard* (1966), 421 Pa. 571, 220 A.2d 807; *McDermott v. State* (1883), 89 Ind. 187; *Valentine v. Commonwealth* (1948), 187 Va. 946, 48 S.E.2d 264; *Butler v. State, supra; Fausett v. State, supra; Lloyd v. State, supra; Potter v. State, supra; State v. Johnson* (1967), 277 Minn. 368, 152 N.W.2d 529; *Mundy v. Commonwealth* (1926), 144 Va. 609, 131 S.E. 242; Annot., 63 A.L.R.3d 936, 945 (1975).

Although proof of the first element of the accident defense will avert a finding of murder or voluntary manslaughter, it will not avoid a conviction for involuntary manslaughter. However, the second two elements of the defense may rebut the State's proof, if any, of the unlawful act element of the crime of involuntary manslaughter. The manslaughter statute, IC 1971, 35-13-4-2 (Burns Code Ed.), in pertinent part, provides:

"Involuntary Manslaughter. Whoever kills any human being without malice, express or implied, involuntarily but in the commission of some unlawful act, is guilty of involuntary manslaughter . . . ."

The State bears the burden of proving that the accused purposely committed an unlawful act which was the proximate cause of the death. *German v. State* (1975), 166 Ind. App. 370, 337 N.E.2d 883; *Demmond v. State* (1975), 166 Ind. App. 23, 333 N.E.2d 922; *Potter v. State, supra;* Annot., 55 A.L.R. 921 (1928).

The unlawful act the State charges Gunn committed was that Gunn intentionally drew Jackson's gun in violation of IC 1971, 35-1-79-1 (Burns Code Ed.):

> "Drawing dangerous weapons.--Whoever draws, or threatens to use, any . . . gun, . . . or other deadly or dangerous weapon, already drawn upon any other person, . . . upon conviction, . . . may be imprisoned not less than one [1] year nor more than three [3] years."

*See: Siberry v. State* (1895), 149 Ind. 684, 39 N.E. 936; *Surber v. State* (1884), 99 Ind. 71. The same statute further provides:

> "Provided, that the provisions of this section shall not apply to a person drawing or threatening to use such dangerous or deadly weapon in defense of his person or property, or in defense of those entitled to his protection by law."

This defense Gunn was not permitted to pursue.

Gunn sought to establish a theory of self-defense until the State's successful objection to his introduction of Defendant's exhibit 1.

The theories of self-defense and accidental homicide are not inconsistent as a matter of law, and may be raised simultaneously in several contexts.

First, the theory of self-defense itself embraces intentional as well as accidental killings. 1 Wharton's Criminal Law and Procedure, §213, p. 464, 465 (1957). In *McDermott v. State, supra*, at 195, our Supreme Court held:

> "In all cases where the killing of the assailant is purposely done by the assaulted party, he must have acted under the belief that such killing was necessary to preserve his own life, or to save himself from great bodily harm, to render the killing excusable. We do not mean to say, however, that to render the

killing excusable the assaulted party must have acted under the belief that the death of the assailant was necessary. As we have said, in proper cases the assaulted party has the right to meet force with force; and if, in a proper defence, death results to the assailant, the killing may be excusable without a belief on the part of the assaulted party that it was necessary for his own safety. In such cases the defence is purposely made, *but the killing is not purposely done. It is simply the result of the defence. Runyan v. State,* 57 Ind. 80 (26 Am. R. 52); Whart. Crim. Law, sec. 1019; Hor. & Thomp. Cases on Self-Defence, 492." (Emphasis added).

Thus, self-defense is available to the accused who accidentally kills his assailant while properly exerting force to assure his own safety.

Second, and similarly, because the proper exercise of the right to defend oneself is a lawful act, such an act may satisfy the requirement that the accused be engaged in a lawful act when a killing occurs accidentally. This context is explained in a Virginia case, *Valentine v. Commonwealth, supra,* 48 S.E.2d at 267-268, wherein that court quoted 40 C.J.S. *Homicide,* §112c, p. 981:

"Ordinarily the law of self-defense is not applicable in a case of a killing resulting from an act which was accidental and unintentional, particularly where the facts of the case are not such as would make such law applicable. However, *where the defense of excusable homicide by misadventure is relied on, the principles of self-defense may be involved not for the purpose of establishing defense of self, but for the purpose of determining whether accused was or was not at the time engaged in a lawful act; and it has been held that in such case the right, but not the law, of self-defense is invoked.* Accused is entitled to an acquittal where he was lawfully acting in self-defense and the death of his assailant resulted from accident or misadventure, as where in falling he struck or overturned an object and thereby received injuries resulting in his death, *or where in a struggle over the possession of a weapon it was accidentally discharged.*" (Emphasis added).

*See also: State v. Crowley* (1940), 345 Mo. 1177, 139 S.W.2d 473.

As a third instance, the two theories of accident and self-defense may be raised simultaneously as independent theories.

*See:* Annot., 63 A.L.R.3d 936, 943 (1975). In *Lloyd v. State, supra,* our Supreme Court implicitly approved the use of both accident and self-defense theories by finding no error in instructions which presented both theories to the jury. *See also: State v. Johnson, supra; People v. Renick* (1938), 368 Ill. 436, 14 N.E.2d 500. Any question whether, in light of the facts, the two theories conflict goes to the weight to be given the facts supporting each theory as determined by the jury. The State offers no authority establishing a trial court's function to choose which defense an accused may pursue or upon what basis the choice might be made by the court for the defendant.

    A meritorious claim of self-defense eliminates the possibility that any crime has been committed. *King v. State* (1968), 249 Ind. 699, 234 N.E.2d 465; *Jennings v. State* (1974), 262 Ind. 476, 318 N.E.2d 358.

    "Our case law in Indiana recognizes the right of every citizen to reasonably defend himself against unwarranted attack. Therefore self-defense in homicide and assault cases must remain a viable rule . . . ." *Johnson v. State* (1971), 256 Ind. 579, 582, 271 N.E.2d 123, 124.

Our legislature reaffirmed this policy by enacting IC 1971, 35-13-10-1 (Burns Code Ed.); *See: Loza v. State* (1975), 263 Ind. 124, 325 N.E.2d 173. A defendant is denied the right to exercise reasonable force in response to an unwarranted attack when he is not permitted to present evidence relevant to the claim of self-defense. When a defendant claims that he acted in self-defense, evidence legitimately tending to support his theory is admissible.

    Prior to Gunn's attempted introduction of Defendant's exhibit 1, testimony of two witnesses had established that there was a scuffle between a man and a woman across the street from the Oasis Bar in the very early morning of November 3, 1973. Other evidence had indicated that Jackson was in an angry mood and that Gunn's temperament was quiet that night. Jackson threatened to hurt Gunn earlier that evening. When talking to the officers, Gunn repeatedly insisted the gun discharged accidentally during a struggle and that he thought she had pulled a knife on

him. Gunn had previously seen her attack a man with that knife. He told an officer about the letter Jackson had written in which she threatened to kill him. Gunn testified that he was frightened and afraid she would cut him. Slight scratches were found on Gunn's forearms, and six rounds for an automatic gun were found in his pocket.

The evidence already presented and Gunn's expressed desire to present a theory of self-defense indicate that self-defense was an issue. *See: Patterson v. State* (1975), 263 Ind. 55, 324 N.E.2d 482. Thus, the trial court erroneously denied Gunn the opportunity to fully present that defense, either as a separate theory of defense or as part of an accident defense.[3]

The question of the existence or appearance of danger to the defendant, the necessity of defending himself, and the amount of force necessary, must be determined from the standpoint of the accused at the time and under the existing circumstances as shown by the evidence. *McKee v. State* (1926), 198 Ind. 590, 598, 154 N.E. 372, 374-375. The State is required to prove the absence of this defense by substantial evidence of probative value either by rebutting the defendant's evidence of self-defense or by relying on the sufficiency of its evidence in chief. *Johnson v. State, supra; Jennings v. State, supra.* Whether the State has successfully borne its burden is a question of fact to be decided by the jury. *McDonald v. State* (1976), 264 Ind. 477, 346 N.E.2d 569. Thus, the merits of such defense may *not* be argued by the State and decided by the trial court before the issue is given to the jury. The trial court erred when it refused to permit Gunn to complete his introduction of evidence in support of a self-defense theory. For this reason, we reverse and remand this case for a new trial.

We will answer two other issues raised by Gunn which may reoccur in a new trial, the first of which is whether the trial court

---

3. *See:* Clinton, *The Right to Present a Defense; An Emergent Constitutional Guarantee in Criminal Trials,* 9 Ind. L. Rev. 711 (1976), for a discussion of the emergence of the United States Supreme Court's recognition of a fundamental right to present a criminal defense.

■ erred when it denied Gunn's request to secure grand jury statements.

"Insofar as the copies of witnesses' statements and grand jury proceedings are concerned, a defendant has a right, upon laying the proper foundation, to statements made by a witness to law enforcement officers and to the grand jury only *after* the witness has testified on direct examination. *Antrobus v. State* (1970), 253 Ind. 420, 254 N.E.2d 873. There is no right to a 'transcript of the grand jury proceedings.'" *Morris v. State* (1975), 263 Ind. 370, 332 N.E.2d 90, 93.

Access to such statements is granted for cross-examination and impeachment purposes. *Antrobus, supra.* The defendant must be allowed to ask questions necessary to lay the proper foundation, unhampered by the objection that the questions reach beyond the scope of direct examination. To lay a proper foundation, he must establish:

"(1) The witness whose statement is sought has testified on direct examination; (2) A substantially verbatim transcription of statements made by the witness prior to trial is shown to probably be within the control of the prosecution; and, (3) the statements relate to matters covered in the witness' testimony in the present case." *Antrobus, supra,* at 253 Ind. 427, 254 N.E.2d 876-877.

Because "matters covered in the witness' testimony" prompted the search for a possible grand jury statement, the fact that the State did not mention the grand jury proceedings on direct examination must not prevent the defendant from extending the scope of cross-examination to encompass relevant foundation questions. Although the trial court has broad discretion to limit the scope of cross-examination, *Borosh v. State* (1975), 166 Ind. App. 409, 336 N.E.2d 409, we find that the trial court abused this discretion when it sustained the State's objection that the defendant's questions, which sought information necessary to satisfy steps (2) and (3) of the *Antrobus* foundation requirement, reached beyond the scope of direct examination.

Gunn's final issue raised the question whether the trial court erred by sustaining the State's objection to the testimony of two

witnesses concerning their personal knowledge of previous acts of violence by the deceased.

Indiana law clearly provides that:

> "The defendant in homicide, where there is some evidence of self-defense, *may prove specific acts of violence committed by the deceased upon third parties, knowledge of which has been communicated to the defendant prior to the homicide,* for the purpose of showing the defendant's state of apprehension, and he ought to be allowed to prove every fact and circumstance known to him and connected with the deceased which was fairly calculated to create an apprehension of his own safety." *McKee v. State* (1926), 198 Ind. 590, 598, 154 N.E. 372. (Emphasis added).

Gunn did not offer to prove that knowledge of the acts of violence, known to the two witnesses, had been communicated to him. The court did not commit error in excluding the evidence.

Judgment reversed and remanded.

Lowdermilk and Lybrook, JJ., concur.

NOTE—Reported at 365 N.E.2d 1234.