Ruben HINOJOSA, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 45A05–0010–CR–450.

Court of Appeals of Indiana.

July 17, 2001.

Rehearing Denied August 16, 2001.

Nathaniel Ruff, Merrillville, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Timothy W. Beam, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Ruben Hinojosa, ("Hinojosa"), appeals the trial court's denial of his Petition for Production of Grand Jury Transcripts.

We reverse.

### ISSUE

Whether the trial court erroneously denied Hinojosa's petition.

### FACTS

The facts most favorable to the State reveal that for the past nineteen years, Hinojosa has been a police officer with the Hammond Police Department. He is currently suspended for allegedly disobeying orders and "going public with statements of corruption in the Hammond Police Department." (R. 179).

The facts underlying Hinojosa's suspension started during the evening hours of October 21, 1997. On that evening, Thomas Hanna ("Hanna"), a lieutenant with the Hammond Police Department, went to the Calumet Tap to socialize with his coworkers and Mayor Duane Dedlow ("Dedlow"). At approximately 10:00 p.m., Hanna left in his department issued unmarked car and responded to a dispatch about shots fired near the Hammond High School. Hanna subsequently confronted a young man named LuJuan Jones ("Jones"), pointed his handgun at Jones, and verbally accosted him. A short time later, Hanna allegedly confronted Jamie Weems ("Weems") and assaulted him in a similar manner.

Jones reported the incident to police. Officer Donald Vicari ("Vicari") responded, but no action was taken. Meanwhile, Hanna returned to the Calumet Tap. After he left, he drove north on Calumet Avenue where he collided with a parked Hammond police car with its emergency lights activated. The collision injured the officer in the police car and the motorist the officer was assisting.

Captain Steven Ridgley ("Ridgley") and Officer George Gavrilos ("Gavrilos") eventually arrived on the scene. Ridgley instructed Gavrilos to take over the investigation. In the meantime, Ridgley allegedly took Hanna to the police garage across the street where Hanna drank coffee for two hours before giving a breath test. Despite the fact that a certified breath test operator was on duty, it was alleged that Ridgley called Sergeant Ronald Gennarelli ("Gennarelli") in from home to administer the breath test. The test results revealed Hanna's blood alcohol content to be ".00 despite the fact [that] Hanna was visibly intoxicated and physically impaired only two hours" earlier. (R. 140). No action was taken against Hanna by the Hammond Police Department.

In the months following this incident, Hinojosa alleged that certain members of the Hammond Police Department and city government had "covered up the drunk driving accident." (R. 179). Hinojosa's statements were printed in the local newspaper. Additionally, he picketed city hall, informed the city council, and solicited help from the Indiana State Police. As a result, a special grand jury was impaneled and testimony was taken from Hanna and other members of the department and city government. Hanna along with several other members of the department were indicted for their actions surrounding the October 21, 1997 incidents. However, the indictments against everyone except Hanna were dismissed because the State did not notify them they were targets of the grand jury investigation.

On November 16, 1998, Jones filed a complaint in the United States District Court for the Northern District of Indiana alleging that members of the Hammond Police Department violated his civil and constitutional rights. Additionally, on January 12, 1999, Jones filed a Petition for Release of Grand Jury Testimony with the trial court; his petition was subsequently granted without objection from the State. On June 9, 2000, the trial court found Hanna guilty of intimidation as a class A misdemeanor and reckless driving as a class B misdemeanor.

Approximately two weeks later, disciplinary charges were brought against Hinojosa. In order to establish his defense under Indiana's whistleblower statute, Hinojosa petitioned the trial court to release the transcripts of the grand jury testimony. After hearing arguments on August 22 and 23, 2000, the trial court denied his petition finding that "there is no authority that permits" the release of the transcripts. (R. 227). On September 22, 2000,

Hinojosa filed his Motion to Correct Error and it was subsequently denied.

## DECISION

Hinojosa appeals the trial court's denial of his petition to release the grand jury transcripts. Specifically, he argues that it is possible for a non-party to obtain grand jury transcripts if he demonstrates a particularized need. Further, Hinojosa argues that he has established his particularized need for the transcripts. The State argues that grand jury proceedings are secret and that Hinojosa can obtain the sought after information from the witnesses.

 We review a trial court's grant or denial of a petition to release grand jury transcripts for an abuse of discretion. *See State ex rel. Keller v. Criminal Ct. of Marion County*, 317 N.E.2d 433, 262 Ind. 420 (Ind.1974) (holding that it is within the discretionary power of trial courts to issue discovery order to produce grand jury transcripts). " 'An abuse of discretion will be found where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the trial court has misinterpreted the law.' " *Rhoades v. State*, 675 N.E.2d 698, 702 (Ind.1996) (quoting *In re Della Lustgarten Nathan Trust*, 638 N.E.2d 789, 790 (Ind.1994)).

Before beginning our analysis, we take note of the reasons behind the secret nature of grand jury proceedings. *See* Ind. Code § 35–34–2–4(i).

> First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appear before the grand jury would be less likely to testify fully and frankly, as they would be open to

retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

*Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 219, 99 S.Ct. 1667, 1673, 60 L.Ed.2d 156 (1979).

■ Taking these reasons into consideration, we now consider the law regarding the release of grand jury transcripts. Generally, there is no right to receive a copy of grand jury transcripts. *See Gunn v. State*, 365 N.E.2d 1234, 174 Ind.App. 26 (Ind.Ct.App.1977). However, Indiana case law reveals that exceptions exist. *See Keller; Dawson v. State*, 324 N.E.2d 839, 163 Ind.App. 493 (Ind.Ct.App.1975); *Dinning v. State*, 269 N.E.2d 371, 256 Ind. 399 (Ind.1971) ("If a party desires certain testimony given before the Grand Jury, he must show good cause with particularity as to why he should have access to such testimony."). Further, in *State v. Heltzel*, 552 N.E.2d 31 (Ind.1990), our supreme court found that the need for protecting the policies behind grand jury secrecy falls off dramatically once the proceedings are concluded. In that case, two reporters from the Hammond Times were charged with indirect criminal contempt for obtaining information from two grand jurors two years after "the close of the grand jury proceedings...." *Id.* at 34. The trial court dismissed the charges, but this court reversed that ruling on First Amendment grounds. Our supreme court then vacated our opinion and found that "under the facts and circumstances here, the reporters' questioning of grand jurors two years after the close of the grand jury proceed-

ings did not impede the administration of justice." *Id.* at 34–35.

Additionally, our General Assembly has enacted a framework allowing for the release of grand jury transcripts; the relevant statute reads as follows:

The transcript of testimony of a witness before a grand jury *may* be produced only upon order of the court which impaneled the grand jury but only after a showing of *particularized need* for the transcript.

Ind.Code § 35–34–2–10(b)(2)(A) (emphasis added). As a result, the issue here is whether the logic and effect of the facts and circumstances before the trial court show that Hinojosa had a particularized need for the grand jury transcripts.

■ When construing a statute that is clear and unambiguous, we may not interpret its meaning. *Moshenek v. Anderson*, 718 N.E.2d 811 (Ind.Ct.App.1999). If the "statute is ambiguous, however, we must ascertain the legislature's intent and interpret the statute so as to effectuate that intent." *Id.* at 813. To determine the legislature's intent, we must consider "the objectives and purposes of the statute in question and the policy underlying the statute's enactment." *Woods v. State*, 703 N.E.2d 1115, 1117 (Ind.Ct.App.1998). However, the term "particularized need" has not been previously defined as used in this statute. *See Bustamante v. State*, 557 N.E.2d 1313 (Ind.1990) (our supreme court took note of the "particularized need" requirement, but it did not reach the issue because the trial court's order granting defendant's petition to release grand jury transcripts was sufficient). Therefore, "its interpretation is controlled by the express language of the statute and by application of the general rules of statutory constructions." *Id.* at 1117. Foremost among these rules is that "we look to the plain language of the statute and attribute the

common, ordinary meaning to terms found in everyday speech." *Id.*

■ In enacting I.C. § 35–34–2–10(b), the legislature has unambiguously created an exception to the general rule preserving the secrecy of grand jury transcripts. Further, because the statute states that the transcripts *may* be released, it is also clear that the release of the transcripts to a person showing a particularized need is not mandatory. In addition, the statute's lack of a limitation on who can seek the release of transcripts signals an intention that parties and non-parties alike may do so. However, the legislature's intended meaning of "particularized need" is not clear. A "need" can be defined as a requirement or the lack of something important. BLACK's LAW DICTIONARY 1054 (7th ed.1999). The term can also mean to have an urgent or essential use for something lacking. BLACK's LAW DICTIONARY 1031 (6th ed.1990); *See City of Dayton v. Borchers,* 13 Ohio Misc. 273, 232 N.E.2d 437, 440 (1967). But not just any "need" will suffice; it must be "particularized," meaning "differentiated from others of the same category." *See* WEBSTER's THIRD NEW INTERNATIONAL DICTIONARY 1647 (3rd 1976). Therefore, in order to show a "particularized need" for grand jury transcripts, the party or non-party must demonstrate that his need for the transcripts is (1) very important; and (2) that the substance of the testimony in the transcripts cannot reasonably be obtained by other means.

■ We now examine whether Hinojosa has a "particularized need." In his petition, Hinojosa argued that he is the subject of disciplinary proceedings seeking to terminate his 19 years of employment with the Hammond Police Department because he allegedly disseminated inaccurate allegations of corruption to the public. As a result, he argues that he needs the grand jury transcripts to prove that his state-ments were true. "Because the grand jury did return indictments, the grand jury transcripts undoubtedly contain some evidence substantiating the claim of a cover-up, particularly when coupled with the fact of defendant Hanna's subsequent conviction." (R. 169).

We find that Hinojosa established that he has a very important need for the transcripts. "The state has a substantial and compelling interest to restrict unethical [and unlawful] practices of its employees and public officials not only for the internal integrity of the administration of government, but also for the purpose of maintaining public confidence in state and local government." *Indiana State Ethics Com'n v. Nelson,* 656 N.E.2d 1172 (Ind.Ct.App.1995). In this case, the record reveals that Hanna was convicted as the result of his deplorable conduct. Hinojosa alleged, and the Lake County Prosecutor agreed, that there was evidence of unlawful conduct on the part of certain members of the Hammond Police Department. The grand jury indicted several police officers, but those indictments were subsequently dismissed because the officers did not receive notice that they were targets of the investigation. Merely two weeks after Hanna was convicted, disciplinary proceedings were initiated against Hinojosa because of his allegations of corruption. For these reasons, Hinojosa has further demonstrated that he has a very important need for receiving copies of the transcripts.

Concerning whether he can reasonably obtain the substance of the testimony by other means, the record reveals that Hinojosa has attempted to obtain relevant information through interrogatories and requests for production from the Hammond Police Department. Further, "the administrative board before whom the disciplinary hearings are pending has refused [his] request to compel discovery in this area."

App. to Hinojosa's Brief at 33. The record suggests that Hinojosa's efforts are being thwarted at every turn and that he cannot reasonably obtain the substance of the testimony from any other source than the grand jury transcripts.

■ Finally, we turn to whether the trial court abused its discretion in denying Hinojosa's petition. As we have already noted, the policies behind maintaining the secrecy of grand jury proceedings are important. However, we find those policies are significantly diminished in this case. For example, the grand jury proceedings have been concluded. *See Heltzel,* 552 N.E.2d 31. Further, the grand jury transcripts have been produced for Jones to assist in his civil suit against Hanna. Here, the logic and effect of the facts and circumstances before the trial court warrant the granting of Hinojosa's petition. Therefore, the ruling of the trial court is reversed and we order the trial court to grant Hinojosa's Petition for Production of Grand Jury Transcripts.

Reversed.

NAJAM, J., concurs.

BARNES, J., dissents with separate opinion.

BARNES, Judge, dissenting.

I respectfully dissent. Although I believe the trial court here was incorrect when it seemed to state that a non-party could *never* obtain grand jury transcripts, I am not persuaded that, at this point, Hinojosa has met his burden to show a "particularized need" for the transcripts. It is not clear to me that this record reflects the fact that the information sought cannot be reasonably obtained through other sources. No witnesses have been shown to be unavailable, and, although the Hammond Mayor has been less than forthcoming with his cooperation, there is no hint that the witnesses who Hinojosa believes have information have been deposed, or that an attempt has been made *to* depose them, or that any of the witnesses were subpoenaed to appear at his disciplinary hearing. I simply believe more effort has to be made here to secure the information before a "particularized need" is shown.

Nevertheless, should potential witnesses stonewall Hinojosa, refuse to cooperate, and in general be obstreperous, the trial court may be compelled to make a finding that a "particularized need" exists, and order the transcripts produced. I am also aware that the transcripts have been released to another non-party in a civil suit which is tangentially related to this matter.

However, grand jury proceedings are confidential for a myriad of logical reasons. I acknowledge that once a criminal investigation has been completed, the reasons for that confidentiality abate, but certainly do not end. Fear of retribution, public embarrassment regarding the most intimate personal or business matters, and a whole host of other legitimate concerns favor the public policy of confidentiality in grand jury matters.