**Jeremy CREAGER, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A02–0001–CR–42.

Court of Appeals of Indiana.

Oct. 17, 2000.

---

Janice L. Stevens, Marion County Public Defender, Indianapolis, Indiana, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Janet L. Parsanko, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

ROBB, Judge

Following a jury trial, Jeremy Creager was found guilty of involuntary manslaughter, a Class C felony, criminal confinement, a Class B felony, and residential entry, a Class D felony. The trial court later sentenced Jeremy to thirty-one years at the Indiana Department of Correction and ordered him to pay restitution in the amount of $100,000.00. Jeremy now appeals his convictions and the restitution order. We affirm in part and reverse and remand with instructions in part.

### Issues

Jeremy raises the following consolidated and restated issues for our review:

1. Whether the trial court properly refused to tender a self-defense instruction to the jury;

2. Whether there was sufficient evidence to support Jeremy's conviction of criminal confinement conviction as a Class B felony;

3. Whether the trial court properly ordered Jeremy to pay restitution to the victim's ex-wife for the loss of child support past the date of sentencing;

4. Whether the trial court properly sentenced Jeremy to thirty-three years at the Indiana Department of Correction; and

5. Whether Jeremy was denied his right to an impartial judge during sentencing.

### Facts and Procedural History

The facts reveal that Jeremy and Mary Creager were married in 1996, and shortly thereafter their marriage produced a daughter. On November 24, 1998, the trial court issued a no contact order prohibiting Jeremy from having contact with Mary as a result of the State charging Jeremy with a crime of violence against Mary.[1] During the early part of December of 1998, Mary informed Jeremy she needed her space and thus, Jeremy began moving his personal items from the marital residence. On December 4, 1998, Jeremy entered the marital residential without Mary's knowledge or consent and hid in an upstairs bedroom closet. Shortly thereafter, Mary, her daughter, and Patrick Johnson entered the marital residence. After putting her daughter to bed, Mary and Patrick proceeded to the master bedroom where they watched a video. At the conclusion of the video, Patrick began to give Mary a massage.

As Patrick was giving Mary a massage, Jeremy entered the bedroom and confronted Patrick and Mary while armed with a baseball bat and his combat knife. Subsequently, a struggle ensued between Pat-

---

1. We note that the trial court prohibited the State from delving into the facts and circumstances surrounding the no contact order. R. 591–92. Jeremy testified at trial that the no contact order resulted from him being charged with a crime of violence against Mary. R. 593–94.

rick and Jeremy, with Jeremy striking Patrick several times with the baseball bat. As the two continued to struggle, Jeremy stabbed Patrick with the combat knife. Patrick than retreated to the bathroom and locked the door. Thereafter, Mary attempted to call 911 on her cell phone but Jeremy took the cell phone and threw it against the wall, breaking it. Subsequently, Jeremy bound Mary's feet and hands with a torn pillowcase. Jeremy then proceeded to repeatedly strike the door of the bathroom with the baseball bat in order to gain admittance to where Patrick was hiding.

During the melee, Mary was able to free herself from her bounds and escape to a neighbor's house. As Mary lay hidden in the neighbor's residence, Jeremy forcefully entered the home in an attempt to overtake Mary. However, Jeremy was unsuccessful in his attempt to locate Mary at the neighbors' residence. Thereafter, Jeremy proceeded back to the marital residence, retrieved his daughter, and fled to South Dakota where he was later apprehended. Patrick later died from his injuries.

Consequently, the State charged Jeremy with murder, robbery, and burglary, all Class A felonies, criminal confinement and invasion of privacy, both Class B felonies, and criminal confinement, a Class D felony. A jury later found Jeremy guilty of criminal confinement, a Class B felony, involuntary manslaughter, a Class C felony, and residential entry, a Class D felony. The trial court sentenced Jeremy to thirty-one years at the Indiana Department of Correction and ordered him to make restitution to Patrick's ex-wife, Denise Johnson, for lost child support in the amount of $100,000.00.[2] This appeal ensued.

*Discussion and Decision*

### I. Self–Defense Jury Instruction

Jeremy first contends that the trial court erred in refusing to instruct the jury on self-defense. We disagree.

**2.** We note that the trial court also ordered Jeremy to make restitution to the neighbors in the amount of $960.00, the amount it cost to fix the door he broke when he forcefully en-

### A. Standard of Review

A defendant is entitled to have the jury instructed correctly on an essential rule of law. *Hill v. State*, 615 N.E.2d 97, 99 (Ind.1993). The giving of jury instructions is a matter within the sound discretion of the trial court, and we review the court's refusal to give a tendered instruction for an abuse of that discretion. *CSX Transp., Inc. v. Kirby*, 687 N.E.2d 611, 616 (Ind.Ct.App.1997), *trans. denied.* Generally, we will reverse a trial court for failure to give a tendered instruction if: 1) the instruction is a correct statement of the law; 2) it is supported by the evidence; 3) it does not repeat material adequately covered by other instructions; and 4) the substantial rights of the tendering party would be prejudiced by failure to give it. *Id.* at 616–17.

### B. Self–Defense Instruction

Jeremy argues that the trial court's refusal to give the jury his tendered instruction on self-defense denied him his right to present a defense and his right to have the jury determine the law and facts. The State argues that the trial court correctly refused to tender a self-defense instruction to the jury because the evidence did not support the giving of the instruction to the jury.

We note initially that a meritorious claim of self-defense eliminates the possibility that any crime has been committed. *Gunn v. State*, 174 Ind.App. 26, 365 N.E.2d 1234, 1239 (1977). The doctrine of self-defense is codified in Indiana Code section 35–41–3–2, which provides in pertinent part:

(a) A person is justified in using reasonable force against another person to protect himself or a third person from what

tered the neighbors' residence on the night of December 4, 1998, in his attempt to find Mary.

he reasonably believes to be the imminent use of unlawful force. However, a person is justified in using deadly force only if he reasonably believes that the force is necessary to prevent serious bodily injury to himself or a third person or the commission of a forcible felony. No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting himself or his family by reasonable means necessary.

\* \* \*

(d) Notwithstanding subsections (a), (b), and (c) of this section, a person is not justified in using force if:

(1) he is committing, or is escaping after the commission of, a crime;

(2) he provokes unlawful action by another person, with intent to cause bodily injury to the other person; or

(3) he has entered into combat with another person or is the initial aggressor, unless he withdraws from the encounter and communicates to the other person his intent to do so and the other person nevertheless continues or threatens to continue unlawful action.

The Indiana Supreme Court has held that when the defendant claims self-defense, he must prove three facts: (1) that he was in a place where he had a right to be; (2) that he acted without fault; and (3) that he had a reasonable fear or apprehension of death or great bodily harm. *Miller v. State*, 720 N.E.2d 696, 700 (Ind.1999). Once a defendant claims self-defense, the State bears the burden of disproving at least one of these elements beyond a reasonable doubt for the defendant's claim to fail. *Sanders v. State*, 704 N.E.2d 119, 123 (Ind.1999). The State may meet this burden by rebutting the defense directly, by affirmatively showing the defendant did not act in self-defense, or by simply relying upon the sufficiency of its evidence in chief. *Lilly v. State*, 506 N.E.2d 23, 24 (Ind.1987). Whether the State has met its burden is a question of fact for the jury. *Birdsong v. State*, 685 N.E.2d 42, 45 (Ind. 1997).

At trial, Jeremy submitted a self-defense instruction to the trial court. R. 138. However, the trial court refused to tender any self-defense instruction to the jury. We have previously held that a defendant in a criminal case is entitled to have the jury instructed on any theory of defense which has some foundation in evidence. *Dayhuff v. State*, 545 N.E.2d 1100, 1102 (Ind.Ct.App.1989). This rule applies even if the evidence is weak and inconsistent. *Harrington v. State*, 413 N.E.2d 622, 624 (Ind.Ct.App.1980). However, the evidence presented at trial must have some probative value to support it. *Bragg v. State*, 695 N.E.2d 179, 180 (Ind.Ct.App. 1998). Furthermore, it is within the province of the jury to determine whether the defendant's evidence was believable, unbelievable, or sufficient to warrant the use of force. *Dayhuff*, 545 N.E.2d at 1102.

In the present case, the trial court determined that Jeremy was not entitled to a self-defense instruction because Jeremy was in a place where he had no right to be due to the no-contact order issued on November 24, 1998. *See* R. 138, 341, 601–03. Generally, the determination of whether a defendant acted in self-defense is a question of fact for the jury. *Jordan v. State*, 656 N.E.2d 816, 818 (Ind. 1995). However, we believe that the trial court did not err in determining as a matter of law that Jeremy was not in a place he was supposed to be, and thus, a self-defense instruction was not warranted.

Jeremy did not contest the facial validity of the no-contact order at trial or on appeal.[3] However, he argues that the order was effectively nullified by his and Mary's

---

**3.** We note that the no-contact order provides that "[t]his order shall remain in effect until [preexisting case involving the battery against Mary] has been tried and the defendant has been sentenced if found guilty." R. 291. The order was a result of the State charging Jeremy with criminal recklessness, a Class D felony.

actions; specifically, their consensual contact with each other after the trial court issued the order. The order provides in pertinent part that:

> [Jeremy] IS ORDERED to have no contact with Mary Creager in person, by telephone or letter, through an intermediary, or in any other way, directly or indirectly, except through an attorney of record, while released from custody pending trial or while participating in a pre-trial diversion program. This includes, but is not limited to, acts of harassment, stalking, intimidation, threats, and physical force of any kind.

R. 291. The record supports Jeremy's contention that the parties had consensual contact after the order was issued on November 24, 1998. However, this consensual contact did not nullify the order. The order provides that "[t]his order shall remain in effect until this case has been tried and the Defendant has been sentenced if found guilty." R. 291. Thus, any contact Jeremy had with Mary after the order was issued on November 24, 1998, was done "at his own peril."

Furthermore, although the no-contact order does not specify the locations Jeremy was to refrain from visiting, the order expressly mandates that Jeremy was to have no contact with Mary. Here, the record indicates that it was not a chance encounter when Jeremy violated the no-contact order on December 4, 1998. At the request of Mary, Jeremy had previously moved his personal belongings from the marital residence and was cohabitating at another location instead of the home. R. 251. Jeremy testified at trial that on December 4, 1998, he entered the marital residence without the knowledge or consent of Mary. R. 539. Jeremy testified that he knew that Mary would be home shortly when he entered the residence. R. 540. In addition, Jeremy testified that after he had been in the residence for a short period of time, he observed Mary, his daughter, and Patrick arrive and enter the home. R. 543. Jeremy testified that

he then proceeded to hide in the upstairs bedroom closet because he wanted to "see what they were going to do." R. 542. Jeremy testified that he later confronted Patrick and Mary in the master bedroom of the home. R. 552. Therefore, we hold that the trial court properly refused to tender a self-defense instruction to the jury because the record supports the trial court's conclusion as a matter of law that Jeremy was not in a place he was supposed to be, and thus, could not demonstrate that he was entitled to the defense.

## II. Sufficiency of the Evidence

Jeremy also contends that there was insufficient evidence to support his conviction for criminal confinement, a Class B felony. We disagree.

### A. Standard of Review

When reviewing a claim of sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind.1995). We look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* The conviction will be affirmed if evidence of probative value exists from which a jury could find the defendant guilty beyond a reasonable doubt. *Id.*

### B. Criminal Confinement as a Class B Felony

Jeremy argues that because the State presented no evidence that he was armed with a deadly weapon when he confined Mary against her will, there exists insufficient evidence to support his conviction for criminal confinement as a Class B felony. The State argues that sufficient evidence was presented at trial that Jeremy was armed with a baseball bat and a combat knife when he restrained Mary against her will.

The criminal confinement statute provides in pertinent part that:

> A person who knowingly or intentionally:

(1) confines another person without the other person's consent; or

(2) removes another person, by fraud, enticement, force, or threat of force, from one (1) place to another;

commits criminal confinement, a Class D felony. However, the offense is a ... Class B felony if it is committed while armed with a deadly weapon. . . .

Ind.Code § 35–42–3–3. Jeremy only challenges the armed with a "deadly weapon" element of his criminal confinement conviction. Therefore, we must determine whether the State presented sufficient evidence at trial that Jeremy was armed with the "deadly weapons" when he restrained Mary against her will.

Mary testified at trial that Jeremy was armed with a baseball bat and a combat knife when he confronted Patrick and her in the master bedroom of the marital residence. R. 264, 266. Mary further testified that Jeremy struck Patrick with the baseball and combat knife during the altercation in the marital residence. *Id.* In addition, Mary testified that Patrick retreated to the bathroom after being stabbed by Jeremy. R. 266. Mary testified at trial that Jeremy then proceeded to hit the bathroom door with the baseball bat in order to gain entry to where Patrick was hiding. R. 268. Mary testified that she then attempted to persuade Jeremy to leave Patrick alone and to leave the marital residence. R. 268. Moreover, Mary testified that Jeremy refused to abide by her pleas and instead bound her hands and feet with a torn pillowcase. R. 270. Mary testified that as Jeremy was attempting to restrain her, he told her to stop struggling or he would go get their daughter. R. 272. Furthermore, Mary testified at trial that Jeremy told her that "none of us were going to make it out of there alive." *Id.* Mary testified that Jeremy then renewed his efforts to gain entry into the bathroom, and that during the time period he was striking the door with the baseball bat, he would intermittently stop and make comments toward her. R. 271. We believe

that sufficient evidence was presented at trial for the jury to infer that Jeremy was armed with a baseball bat and a combat knife when he restrained Mary against her will. Therefore, we hold that there was sufficient evidence to support Jeremy's conviction for criminal confinement as a Class B felony.

### III. Restitution Order

In addition, Jeremy contends that the trial court erred in ordering him to pay $100,000.00 in restitution to Patrick's ex-wife for child support. We agree.

### A. Standard of Review

An order of restitution is within the trial court's discretion and will be reversed only upon finding an abuse of discretion. *Vanness v. State,* 605 N.E.2d 777, 783 (Ind.Ct.App.1992), *trans. denied.* Under an abuse of discretion standard, we will affirm the trial court's decision if there is any evidence supporting the decision. *Gleason v. Bush,* 689 N.E.2d 480, 484 (Ind. Ct.App.1997).

### B. Child Support Payments

Jeremy argues that the trial court lacked the authority to order restitution for lost child support. The State argues that the Indiana restitution statute vests trial courts with the discretion to order restitution for lost child support.

We note initially that restitution is utilized by courts as a means to impress upon a criminal defendant the magnitude of the loss he has caused and his responsibility to make good that loss as completely as possible. *Kotsopoulos v. State,* 654 N.E.2d 44, 46 (Ind.Ct.App.1995), *trans. denied.* These are traditional goals in sentencing a defendant and thus, an order of restitution is as much a part of a criminal sentence as a fine or other penalty. *Id.*

On September 28, 1999, the trial court entered a restitution order which provides in pertinent part that:

The Court having found [Jeremy] guilty in the above captioned cause of the Offense(s) of [in]voluntary manslaughter, criminal confinement, and residential entry as charged in Count(s) 1, 5, 6 of the Information and the Court being duly advised in the premises FINDS that Denise Johnson, the Victim of said Offense(s), is entitled to Restitution in the amount of $100,000.00 from [Jeremy].

R. 202 (emphasis in original). The trial court entered the restitution order in favor of Denise for the child support she would not receive as a result of the death of her ex-husband. R. 724.

■■■■■ Indiana statute vests trial courts with the authority to order a defendant to make restitution. Specifically, Indiana Code section 35–50–5–3 provides in pertinent part that:

(a) Except as provided in subsection (i), in addition to any sentence imposed under this article for a felony or misdemeanor, the court may, as a condition of probation or without placing the person on probation, order the person to make restitution to the victim of the crime, the victim's estate, or the family of the victim who is deceased. The court shall base its restitution order upon a consideration of:

(1) property damages of the victim incurred as a result of the crime, based on the actual cost of repair (or replacement if repair is inappropriate);

(2) medical and hospital costs incurred by the victim (before the date of sentencing) as a result of the crime;

(3) earnings lost by the victim (before the date of sentencing) as a result of the crime including earnings lost while the victim was hospitalized or participating in the investigation or trial of the crime; and

(4) funeral, burial, or cremation costs incurred by the family or estate of a homicide victim as a result of the crime.

A trial court's sentencing authority is limited to the statutory parameters prescribed by the Indiana General Assembly. *Roach v. State*, 711 N.E.2d 1237, 1238 (Ind.1999). When construing a criminal statute, "[w]ords and phrases shall be taken in their plain, or ordinary and usual, sense." Ind.Code § 1–1–4–1(1); *see Matthews v. State*, 515 N.E.2d 1105, 1106 (Ind. 1987). Thus, our inquiry is limited to the determination of whether the loss of future child support falls within the ambit of Indiana Code section 35–50–5–3.

The Indiana Supreme Court has stated that:

the word "victim" in the statutes authorizing restitution has not been construed so narrowly as to limit the payment of restitution only to the person or entity actually subjected to the commission of the crime. Rather, restitution has properly been ordered payable to those shown to have suffered injury, harm or loss as a direct and immediate result of the criminal acts of a defendant. The survivors of murder victims, particularly their dependent children, could certainly come within this class.

*Reinbold v. State*, 555 N.E.2d 463, 470–71 (Ind.1990), *overruled on other grounds*, 658 N.E.2d 563 (Ind.1995). Therefore, Patrick's children are clearly "victims" entitled to restitution under the statute. Although an adult victim relies upon his or her wages to provide sustenance, a child victim relies upon child support as a means for providing life's necessities. Correspondingly, child support qualifies as "lost earnings" for the child victim within the meaning of Indiana Code section 35–50–5–3(a)(3) because the death of the adult victim results in the cessation of child support payments. Thus, the trial court was vested with the authority to order Jeremy to make restitution to Patrick's dependent children in care of Denise for the loss of child support.

██ However, we believe that the trial court exceeded its authority when it ordered Jeremy to make restitution for the future loss of child support. Indiana Code section 35–50–5–3(a)(3) limits restitution to earnings lost before the date of sentencing. In the present case, the trial court ordered Jeremy to pay restitution for the child support Patrick would be unable to pay due to his death based upon a future time span of eleven years from the date of Jeremy's sentencing. R. 724. Thus, we hold that the trial court erred in ordering Jeremy to pay restitution for the loss of child support past the date of sentencing, September 23, 1999.[4] Therefore, we reverse the court's restitution order for the loss of child support and remand with instructions to the trial court to recalculate the amount of restitution for the time period from the date of Patrick's death, December 4, 1998, to the date before Jeremy's sentencing, September 22, 1999.

## IV. Sentencing

Jeremy further contends that the trial court erred in imposing sentence. We disagree.

### A. Standard of Review

██ It is axiomatic that sentencing decisions are committed to the sound discretion of the trial court, and we will reverse a sentence only upon manifest abuse of discretion. *Ault v. State*, 705 N.E.2d 1078, 1081 (Ind.Ct.App.1999). Because a certain degree of subjectivity cannot be eliminated from the sentencing process it is inappropriate for an appellate tribunal to substitute its opinion regarding sentencing for that of the trial court. *Id.* We will not revise a sentence unless it is manifestly unreasonable in light of the nature of the offense and the character of the offender. *Thacker v. State*, 709 N.E.2d 3, 10

(Ind.1999); Ind. Appellate Rule 17(B). The issue before an appellate court is not whether in its judgment the sentence is unreasonable, but whether it is clearly, plainly, and obviously so. *Thacker*, 709 N.E.2d at 10.

### B. Enhancement of Sentence

Jeremy argues that the trial court erred in imposing sentence because it utilized improper aggravating circumstances and failed to address mitigating circumstances. The State argues that the trial court did not exceed its authority in enhancing Jeremy's sentences.

██ Indiana Code section 35–38–1–7.1 governs the use of aggravating and mitigating factors and lists specific factors that a court may consider while sentencing. In enhancing a sentence, the court should: (1) identify the significant aggravators and mitigators; (2) relate the specific facts and reasons which lead the court to find those aggravators and mitigators; and (3) demonstrate it has balanced the aggravators against the mitigators in reaching its sentence. *Ajabu v. State*, 722 N.E.2d 339, 342 (Ind.2000).

#### 1. Aggravating Circumstances

██ Here, the trial court found as aggravating circumstances: (1) Jeremy's denial and prevention of Patrick from receiving medical attention; (2) violation of the no-contact order; (3) Jeremy's criminal history including prior acts of violence against Mary; and (4) Jeremy's act of putting his daughter at risk by the events that unfolded on December 4, 1998, leading up to his later arrest in South Dakota. R. 723–24. Although Indiana Code section 35–38–1–7.1(b) lists factors that may be considered by the trial court as aggrava-

---

**4.** We invite the Indiana General Assembly to reconsider Indiana Code section 35–50–5–3 in light of our opinion in this case. It is tragic that the children of the decedent in this case, while the most innocent of all surviving victims, are also those most harmed by the trial court's inability to consider future lost child support as an item for restitution. However, the General Assembly is the proper branch of Indiana government to make the policy considerations and determination which would amend Indiana Code section 35–50–5–3 to make the loss of future child support an item subject to restitution.

ting circumstances, the court has discretion to consider other relevant factors. *Allen v. State,* 722 N.E.2d 1246, 1251 (Ind. Ct.App.2000). Furthermore, the trial court is not required to "specifically address and discuss each of the factors listed in the statute." *Jones v. State,* 614 N.E.2d 936, 937 (Ind.1993). A single aggravating circumstance may be used both to enhance a sentence and impose consecutive sentences. *Thacker,* 709 N.E.2d at 10. We hold that the trial court did not abuse its discretion in determining that the above-mentioned circumstances were aggravators. In addition, our review of the record reveals that the trial court properly listed the specific facts and reasons that led to its finding of the existence of each aggravating circumstance. *See* R. 720–21, 723–24.

### 2. Mitigating Circumstances

With regard to mitigating circumstances, it is within the trial court's discretion to determine both the existence and weight of a significant mitigating circumstance. *Jones v. State,* 705 N.E.2d 452, 454 (Ind.1999). Given this discretion, we will conclude that a trial court overlooked a mitigating circumstance only when the record contains substantial evidence of a significant mitigating circumstance. *Id.* at 455. A trial court must include mitigators in its sentencing statement only if they are used to offset aggravators or to reduce the presumptive sentence, and only those mitigators found to be significant must be enumerated. *Battles v. State,* 688 N.E.2d 1230, 1236 (Ind. 1997). In addition, a trial court is not required to find the presence of mitigating circumstances or to give the same weight or credit to mitigating evidence as does the defendant. *Fugate v. State,* 608 N.E.2d 1370, 1374 (Ind.1993). Moreover, the trial court is not obligated to accept the defendant's contentions as to what constitutes a mitigating circumstance. *Legue v. State,* 688 N.E.2d 408, 411 (Ind.1997). Although a trial court must consider evidence of mitigating circumstances presented by the defendant, it is not obligated to explain why it has found that the mitigator does not exist. *Allen,* 722 N.E.2d at 1252.

In the present case, the trial court found only one mitigator, Jeremy's military service, and rejected it, stating that "the Court believes that [Jeremy] put the training and weapons given to him by the military to illegal use in committing the crime that [is] the subject of this case." R. 724. We cannot say that the trial court abused its discretion in determining that Jeremy's military service was not a mitigating circumstance. Moreover, we conclude that the trial court properly provided a statement listing the reason that led to its finding that Jeremy was not entitled to any mitigating circumstances. *See* R. 724.

### 3. Balancing Test

When a trial court performs the required balancing process, the balancing test need not be quantitative, and is generally qualitative. *Archer v. State,* 689 N.E.2d 678, 684 (Ind.1997). Furthermore, when the trial court properly identifies and articulates all significant aggravators and mitigators, proper balancing merely requires the trial court to indicate that the aggravating circumstances outweigh the mitigating circumstances. *Carter v. State,* 711 N.E.2d 835, 840 (Ind.1999). In the present case, the trial court found no mitigating circumstances. Therefore, we hold that the trial court did not err in imposing enhanced sentences of eight years for involuntary manslaughter, twenty years for the criminal confinement, and three years for the residential entry convictions.

### V. Impartial Judge

Jeremy also contends that the trial judge was not impartial during his sentencing. We disagree.

Jeremy argues that the trial judge's sentencing statement shows that she was personally biased against him. The State argues that the judge was understandably disturbed by the circumstances of this case

but Jeremy has failed to establish that the judge had any particular bias which rendered the judge unable to impose a reasonable sentence.

We note initially that the Code of Judicial Conduct establishes standards for the ethical conduct of judges. The Preamble to the Code provides in pertinent part that:

> The Code of Judicial Conduct is not intended as an exhaustive guide for the conduct of judges. They should also be governed in their judicial and personal conduct by general ethical standards. The Code is intended, however, to state basic standards which should govern the conduct of all judges and to provide guidance to assist judges in establishing and maintaining high standards of judicial and personal conduct.

These standards are articulated in judicial cannons contained in the Code. We believe that two judicial canons are implicated in the present case. Specifically, Judicial Conduct Canon 3(B) provides in pertinent part that:

> (4) A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, personal characteristics or status, and shall not permit staff, court officials and others subject to the judges' direction and control to do so.

Commentary to Canon 3(B)(4) provides that:

> A judge must perform judicial duties impartially and fairly. A judge who manifests bias on any basis in a proceeding impairs the fairness of the proceeding and brings the judiciary in disrepute. Facial expression and body language, in addition to oral communication, can give parties or lawyers in the proceeding, jurors, the media and others an appearance of judicial bias. A judge must be alert to avoid behavior that may be perceived as prejudicial.

Furthermore, Indiana Judicial Conduct Canon 3(E) provides in pertinent part that:

> (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
>
> (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding.

 We have held that a judge is presumed unbiased and unprejudiced, and to rebut the presumption, the defendant must establish from the judge's conduct actual bias or prejudice which places the defendant in jeopardy. *Cook v. State*, 612 N.E.2d 1085, 1088 (Ind.Ct.App.1993). Such bias or prejudice exists only where there is an undisputed claim or where the judge has expressed an opinion on the merits of the pending controversy. *Smith v. State*, 535 N.E.2d 1155, 1157 (Ind.1989). Adverse rulings or the imposition of the maximum possible sentence do not support a claim of bias. *Radcliff v. State*, 579 N.E.2d 71, 73 (Ind.1991). Moreover, the mere fact a judge has an emotional reaction does not demonstrate that the judge is biased or prejudiced. *Cook*, 612 N.E.2d at 1088. Chief Justice Shepard of the Indiana Supreme Court set forth the test for recusal as "whether an objective person, knowledgeable of all the circumstances, would have a reasonable basis for doubting the judge's impartiality." *Tyson v. State*, 622 N.E.2d 457, 459 (Ind.1993). The question is not whether the judge's impartiality is impaired in fact, but whether there exists a reasonable basis for questioning the judge's impartiality. *Id.*

 After reviewing the record, we cannot say that Jeremy was denied an impartial judge during the sentencing hearing. We agree with Jeremy that the record reveals that the judge was emotion-

ally upset during the sentencing phase at trial. She clearly chastised Jeremy during the imposition of his sentences, in effect, asking him if he understood the impact of his actions on the night of December 4, 1998. Given the nature of the crimes and the fact that we have already determined that the enhancement of the sentences were proper, we find no basis to conclude that the judge was biased toward Jeremy or that her recusal was warranted. Therefore, we hold that Jeremy was not denied an impartial judge during the sentencing phase of his trial.

### Conclusion

Based on the foregoing, we hold that the trial court properly refused to tender a self-defense instruction to the jury. In addition, we hold that there was sufficient evidence to support Jeremy's conviction for criminal confinement, a Class B felony. We further hold that the trial court erred in ordering restitution for the loss of child support past the date of Jeremy's sentencing, and reverse and remand with instructions to the trial court to recalculate that restitution order. We further hold that the trial court properly sentenced Jeremy on the involuntary manslaughter, criminal confinement, and residential entry convictions and that he was not denied an impartial judge during the sentencing phase of the trial.

Affirmed in part and reversed and remanded with instructions in part.

MATHIAS, J., and MATTINGLY, J., concur.