**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**STEVEN KNECHT**
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| RAY A. CHAMORRO, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 91A05-1309-CR-445 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE WHITE SUPERIOR COURT
The Honorable Robert B. Mrzlack, Judge
Cause No. 91D01-1210-MR-136

**May 29, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Ray Chamorro (Chamorro), appeals his conviction for Count I, murder, Ind. Code § 35-42-1-3.

We affirm.

## ISSUES

Chamorro raises two issues on appeal which we restate as follows:

(1) Whether the trial court abused its discretion in refusing to instruct the jury on self-defense; and

(2) Whether the trial court abused its discretion by admitting two autopsy photographs.

## FACTS AND PROCEDURAL HISTORY

On October 1, 2012, Alexandria Chapman (Chapman) communicated to David Jones (Jones) that she wanted to "get high." (Transcript p. 53). On the same day, Jones called Robert Breeden (Breeden), a drug supplier, met with him, and purchased a quarter gram of methamphetamine. Jones took it back to Chapman's house. Also present at the house was Robby Brown (Brown) and Chamorro. According to Jones, he gave a little bit of the methamphetamine to Brown, Chamorro, and Chapman. He then used the rest of the methamphetamine. Jones never felt a rush. The next day, Jones received a phone call from Chris Martin (Martin), also a friend to Breeden, who told him that Breeden had sold him bad drugs. Soon after, Jones placed a call to Breeden and complained of the bad drugs. Breeden promised Jones he would take care of him the next time he cooked a batch.

2

On October 3, 2012, Chamorro, Jones, Brown, Chapman, and LaShae Ramsey (Ramsey) were hanging out at Brown's house. That evening, Jones called Breeden several times, demanding that he delivers on his promise and replace the bad drugs. During one of the many phone calls that Jones made to Breeden, Tye Rentfrow (Rentfrow), a friend to Breeden and who also helped to manufacture the methamphetamine, grabbed the phone from Breeden and told Jones, "[y]ou'll get it at [7:00] a.m." (Tr. p. 58). Jones asked who he was talking to, and Rentfrow responded, "It's your daddy, bitch." *Id*. The comment angered Jones, and he started arguing with Rentfrow. Jones kept calling Breeden's phone, but every time either Rentfrow or Breeden would hang up. On one of the calls that went through, Chamorro grabbed the phone from Jones and started yelling at Rentfrow, asking him, "Do you know who the fuck you're talking to, bitch? [] Where the fuck you at?" (Tr. p. 185).

After the heated exchange, Chamorro and Jones decided to go find Rentfrow. Before that though, Chamorro wanted to go back to his house to obtain his gun. At the time, Ramsey was the only person who had a car. At first she refused to take Chamorro, but she eventually agreed. All five got in the car and drove to Chamorro's house. After Chamorro retrieved his gun, Ramsey drove the men to Martin's house. Martin's house, to some extent, operated as a flop house where people, including Breeden spent time. On their way their way to Martin's house, according to Ramsey, Jones asked Chamorro why he needed the gun and Chamorro responded by saying "I'm tired of people out here thinking I'm a bitch. I'm going to show them I ain't a bitch." (Tr. p. 498). Ramsey

3

dropped off Chamorro, Jones, and Brown at Martin's house and then she left with Chapman.

Once Chamorro, Jones, and Brown were inside the house, they found a passed out Martin in the hallway. Jones shook him aggressively until he woke up. Next, Chamorro pointed a gun to Martin's head and asked him to call Breeden. Martin called Breeden and asked him to bring back his car which Breeden had been borrowing. Breeden promised Martin that he would be at Martin's house in about ten minutes. They waited for about ten to fifteen minutes before Martin suggested that Breeden and Rentfrow might be down at "Tioga Bridge," cooking methamphetamine. (Tr. p. 194). Just as the men were leaving Martin's house, Breeden and Rentfrow pulled into the driveway in Martin's car. Jones and Chamorro saw the car as they were walking away from the house, so they changed their course and ran toward Martin's car. Rentfrow hopped out from the passenger seat. Once outside the car, Jones asked Rentfrow if he had called him a bitch, but Rentfrow denied having said that. At that moment, Jones punched Rentfrow in the face. Rentfrow staggered back toward the car but caught his balance and came right back. At that point, Chamorro pulled out his gun and shot straight at Rentfrow. Rentfrow ran from the scene screaming, clutching his chest but later fell at the corner of the Martin's house. Chamorro also fired two additional shots toward the house as he was running away from the scene. During the same time or close to the end of the third shot, Jones, Brown, and Chamorro took off running in different directions but soon reunited at a high school nearby. Brown then called Ramsey and asked her to pick them up. Before Chamorro got inside the car, he hid the gun under a garbage can. While in the car, Chamorro admitted that he had shot Rentfrow in

4

the chest. Ramsey drove Chamorro and Jones to Chicago and returned to Indiana with Brown and Chapman. Meanwhile, at the crime scene, Breeden called 911, and shortly thereafter the police arrived, arrested Breeden and started their investigation.

On October 26, 2012, the State filed an Information charging Chamorro with Count I, murder, I.C. § 35-42-1-3. On November 2, 2012, the State filed an amendment, adding, Count II, felony murder, I.C. § 35-42-1-1(3). However, on June 4, 2013, the State moved to dismiss the felony murder Count. A four-day jury trial was conducted from July 15 through July 18, 2013. At trial, Chamorro requested a jury instruction for self-defense, which the trial court denied. At the close of the evidence, the jury found Chamorro guilty as charged. On August 22, 2013, the trial court sentenced him to sixty years, executed.

Chamorro now appeals. Additional information will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Self-Defense Instruction*

Chamorro contends that the trial court abused its discretion by refusing to instruct the jury on self-defense. The giving of jury instructions is a matter within the sound discretion of the trial court, and we review the trial court's refusal to give a tendered instruction for an abuse of that discretion. *Creager v. State*, 737 N.E.2d 771, 776 (Ind. Ct. App. 2000), *trans. denied.* Generally, we will reverse a trial court for failure to give a tendered instruction if: (1) the instruction is a correct statement of the law; (2) it is supported by the evidence; (3) it does not repeat material adequately covered by other instructions; and (4) the substantial rights of the tendering party would be prejudiced by the court's failure to give it. *Id*.

Moreover, we note that a defendant in a criminal case is entitled to have the jury instructed on any theory of defense that has some foundation in the evidence. *Id*. at 777. We apply this rule even if the evidence is weak and inconsistent so long as the evidence presented at trial has some probative value to support it. *Id*. Further, we recognize it is within the province of the jury to determine whether the defendant's evidence was believable, unbelievable, or sufficient to warrant the use of force. *Id*.

Additionally, our supreme court set forth three factors that a defendant must prove to support his claim for self-defense: (1) that he was in a place where he had a right to be; (2) that he acted without fault; and (3) that he has a reasonable fear or apprehension of death or great bodily harm. *Miller v. State*, 720 N.E.2d 696, 700 (Ind. 1999).

In denying Chamorro's self-defense instruction, the trial court noted that Chamorro provoked and instigated the confrontation. We also note that Chamorro's claim of self-defense failed in two ways—Chamorro did not act without fault, and he was not in reasonable fear of death or great bodily harm. The evidence shows that it was Chamorro who brandished the gun and fired shots at Rentfrow. Prior to the shooting, Chamorro was angry at Rentfrow for disrespecting him on the phone. Chamorro and Jones wanted to find Rentfrow and seek revenge. First, they drove to Chamorro's house, where Chamorro picked up his gun. Afterwards, Ramsey drove the men to Martin's house. When they were inside Martin's house, Chamorro pointed his gun at Martin and demanded that he call Breeden. When Breeden and Rentfrow pulled into the driveway, both Chamorro and Jones, who were walking away from Martin's house, changed their course and ran toward the car to confront Breeden and Rentfrow. When Rentfrow jumped out of the vehicle, neither

6

Chamorro nor Jones retreated. Instead, Jones punched Rentfrow in the face, and Chamorro pulled out his gun and shot Rentfrow.

Moreover, the evidence does not show that Chamorro was in reasonable fear of death or great bodily harm. Chamorro's self-serving testimony that during the altercation, Rentfrow dipped his hands in his sweater as if to reach out for "something steel" from his pocket, is simply a request for this court to reweigh the evidence and credit his version of events, which we will not do.

In addition, the trial court's decision refusing to tender the self-defense instruction was premised on the fact that Chamorro was the initial aggressor and that he first opened fire to an unarmed Rentfrow. Lastly, we find that Chamorro's use of force was excessive, thus his right to claim self-defense was extinguished. *See Mateo v. State,* 981 N.E.2d 59, 72 (Ind. Ct. App. 2012), *trans. denied.*

In sum, because there is no evidence to support the tendering of the instruction, we conclude that the trial court did not abuse its discretion in refusing to give a self-defense instruction.

## II. *Autopsy Photographs*

Lastly, Chamorro argues that the trial court abused its discretion when it admitted into evidence, over his objection, the autopsy photographs at trial.

The admission and exclusion of photographic evidence falls within the trial court's sound discretion and we review the admission of said evidence for an abuse of discretion. *Alsheik v. Guerrero*, 956 N .E.2d 1115, 1128 (Ind. Ct. App. 2011), *reh'g denied*. Relevant photographic evidence is admissible unless its probative value is substantially outweighed

7

by the danger of unfair prejudice. *Id*. Gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe orally. *Id*. Photographs, even those gruesome in nature, are admissible if they act as interpretative aids for the jury and have strong probative value. *Id*. The potential that passions may be aroused by the gruesomeness of the photograph is not sufficient grounds for exclusion if the photograph is material and relevant. *Id*.

Further, autopsy photos often present a unique problem because the pathologist has manipulated the corpse in some way during the autopsy. Therefore, autopsy photographs are generally inadmissible if they show the body in an altered condition. *Id*. This is so because the photographs may impute to the accused the handiwork of the pathologist and thereby render the defendant responsible in the minds of the jurors for the cuts, incisions, and indignity of an autopsy. *Custis v. State*, 793 N.E.2d 1220, 1225 (Ind. Ct. App. 2003), *trans. denied*. However, there are situations where some alteration of the body is necessary to demonstrate witness testimony. *See id*.

The two photographs at issue were State's Exhibits 15 and 17. The first showed a metal dowel inserted into the bullet wound, and the second showed Rentfrow's heart held outside the body with the metal dowel rod inserted. Chamorro argues that these photographs were irrelevant in establishing Rentfrow's cause of death because it was not disputed that he died from a bullet wound. Also, Chamorro argues that the photographs were gruesome in nature and had the potential risk of inflaming the passions of the jury. The State, however, maintains that these two photographs were helpful in assisting the jury

8

understand Chamorro's stance during the shooting, and also visualize the trajectory of the bullet fired by Chamorro. We agree.

The record reflects that the photographs were relevant in describing Rentfrow's autopsy, including the procedures and the results. More importantly, the pathologist testified at trial that the "bullet went straight through the breastbone" and was on a "flat plane." (Tr. p. 335). Thus, both autopsy photographs revealed that the wound inflicted on Rentfrow was on a level shot, and that Chamorro was standing in front of Rentfrow when he made the shot. Furthermore, the photographs also dispelled Chamorro's claim that he fired the shots blindly, and not directly to Rentfrow, as he was running away from the scene.

Moreover, the relevance of the photographs is not lessened by Chamorro's claim that he did not contest Rentfrow's cause of death. The State had to prove beyond reasonable doubt that Chamorro intentionally killed Rentfrow. It is well-established that "'the State is entitled to prove its case by evidence of its own choice, and that a criminal defendant may not stipulate his or her way out of the full evidentiary force of the case to be presented against him or her [.]'" *State v. Lewis*, 883 N.E.2d 847, 853 (Ind. Ct. App. 2008) (quoting *Hines v. State*, 801 N.E.2d 634, 635 (Ind. 2004)).

Finally, the graphic and gruesome character of the photographs was not unfairly prejudicial simply because they depicted the autopsy. The pathologist testified in depth about the autopsy, how it was performed, and that he inserted the dowel rods so as to show the trajectory of the bullet. Further, the jury was not so overcome with passion that it unintelligently convicted Chamorro.

In conclusion, we find that the autopsy photographs were relevant and their probative value outweighed any potential prejudice to Chamorro. Accordingly, the trial court did not abuse its discretion by admitting these photographs into evidence at Chamorro's trial.

## CONCLUSION

Based on the foregoing, we find that the trial court did not abuse its discretion in refusing to instruct the jury on self-defense or by admitting the autopsy photographs into evidence.

Affirmed.

ROBB, J. and BRADFORD, J. concur